[No. 3,729.]

SAVINGS AND LOAN SOCIETY *v.* ALEXANDER AUSTIN, AND BARTLETT DOE AND JOHN S. DOE *v.* ALEXANDER AUSTIN, Tax Collector of the City and County of San Francisco.

Power to Create State Board of Equalization.—It is within the constitutional powers of the Legislature to create a State Board, for the equalization of the assessed value of property between the different counties of this State.

Idem.—That part of the Act creating a State Board of Equalization which provides that the Controller of State shall be one of its members, and the other two shall be appointed by the Governor, is not in conflict with the Constitution.

Idem.—That part of the Act creating a State Board of Equalization which gives to said Board the power to fix the rate of taxation for State purposes, is not unconstitutional.

Revenue Act in Political Code Applies to San Francisco.—The general revenue system provided in the Political Code, which went into effect in 1872, applies to the City and County of San Francisco.

Taxation of Solvent Debts. — Solvent debts are "property" within the meaning of that word as used in the Constitution, and are liable to taxation.

Relief in Case of Double Taxation. — In a case of double taxation, to entitle a party to relief in the Courts, it must appear that the tax has once been paid or tendered.

One Tax Must be Paid in Case of Double Taxation.—Because the same subject matter has been twice taxed, it by no means follows that both taxes are void, and that it must escape taxation.

ENJOINING COLLECTION OF TAX. — Courts of equity will not interfere by injunction to restrain the sale of property for delinquent taxes, unless it appears that the enforcement of the tax would lead to a multiplicity of suits, or produce irreparable injury, or where the property is real estate, and the sale casts a cloud upon the title of the complainant.

By WALLACE, C. J., NILES, J., *concurring:*

STATE BOARD OF EQUALIZATION UNCONSTITUTIONAL. — The Act creating a State Board of Equalization is unconstitutional, because the members of the Board are not elected by the people, and the Board is given the power of performing in part the functions of Assessors, and because the power conferred on the Board of fixing the rate of State taxation is a delegation of legislative power.

By WALLACE, C. J., and RHODES, J.:

DOUBLE TAXATION. — The Courts have no authority to declare that solvent debts are not taxable, because to tax them might amount to double taxation. The mode and manner of assessing solvent debts is a matter of legislative discretion.

By CROCKETT, J., NILES, J., *concurring:*

DOUBLE TAXATION. — If a debt for money lent, which is secured by mortgage, is taxed, and the mortgaged property is also taxed, it is double taxation, and a violation of the Constitution.

By BELCHER, J.:

TAX ON SAVINGS BANK. — When money is deposited in a savings bank to be loaned out for the benefit of the depositor, if it is taxed to the depositor, and the bank has loaned the money and is taxed upon the note and mortgage, it is double taxation.

APPEAL from the District Court of the Fifteenth Judicial District, City and County of San Francisco.

The Savings and Loan Society was a corporation and had no capital except the sum of five hundred thousand dollars, which was invested in United States Government bonds. All the solvent debts owing to the corporation were due for moneys deposited by depositors, loaned out at interest, to be repaid to the depositors when returned by the borrowers, with net interest accumulating from time to time. The loans were secured by mortgage to the corporation. For

the fiscal year 1872–3 there was assessed to the corporation, for purposes of State and city and county taxation, solvent debts valued at seven million nine hundred and sixty-eight thousand seven hundred and forty dollars, on which the tax was one hundred and nineteen thousand five hundred and thirty-one dollars and ten cents. The State Board of Equalization levied for said fiscal year a tax of fifty cents on the hundred dollars for State purposes. The revenue for said fiscal year, in the City and County of San Francisco, was levied and assessed according to the provisions of the Political Code, which differed in many respects from the old law under which taxes were assessed and collected in said city and county. The tax became delinquent, and this action was brought to enjoin the Tax Collector from selling property.

There was assessed for the same fiscal year to the Does, solvent debts secured by mortgages, and their action was brought to enjoin the sale of property for the tax.

The Court granted a preliminary injunction in each case, and motions to dissolve were heard in each case, upon the complaint, answer, and upon testimony taken in open Court. The Court below refused to dissolve the injunctions, and the defendant appealed. Both cases were contained in the same transcript, and they were submitted on the same arguments.

The other facts are stated in the opinion.

[In the case of the *People* v. *Ashbury*, reported in this volume (*post*), the Court states what its decision here was, on the question of the taxation of solvent debts.]

*Creed Haymond, Henry Edgerton, J. G. Eastman, J. Hoge, W. C. Burnett,* and *John L. Love, Attorney General,* for the Appellant.

The provisions of the Political Code creating a State Board of Equalization are constitutional. The provision that the Board of Equalization, in fixing the rate of State taxation may allow "for delinquency in the collection of taxes," is valid. It does not delegate to the Board power to make laws. (Political Code, Sec. 3696; 1 Black Comm. 309, 310, 311, 312, 313.) The legislative power is the authority under the Constitution to make laws and to alter or repeal them. (Bouvier's L. D., Title "Legislative Power.")

If the delegation is of a power to make laws, the power has not been exercised. (Political Code, Sec. 3713; Stats. 1871-2, p. 680; Stats. 1871-2, p. 672; Stats. 1857, p. 300; Stats. 1860, p. 352; Constitution, Art. VIII; Political Code, Sec. 19.)

The property is subject to taxation. It is the property of the corporation. (*Gorham* v. *Gilson,* 28 Cal. 483; *Gashwiller* v. *Willis,* 33 Cal. 19; *Wheelock* v. *Moulton,* 15 Vt. 521; Angell and Ames on Corp., Sec. 221.) And as such is subject to taxation. (*People* v. *McCreery,* 34 Cal. 434; *Lick* v. *Austin,* 43 Cal. 590; *People* v. *Eddy,* 43 Cal. 331.)

The remedy is not by injunction. According to the principles and practice which prevail in Courts of equity an injunction will be granted to restrain a Tax Collector from collecting taxes only in a few exceptional cases; and in those cases if a tax is legal in part, and in part illegal, the taxpayer must pay the valid tax before he is entitled to an injunction against that part which is invalid.

But under the Code a Tax Collector cannot be enjoined from collecting taxes; because, first, the taxpayer has an adequate remedy at law; and secondly, the Tax Collector is

an officer of the law, engaged in executing a public statute
for the benefit of the people.   The sale does not cloud the
title.   It is not averred that any deed will ever be made.
(Civil Code of California, Sec. 3423; 1 Van Santvoord's Eq.
Pr. 347; *Thompson* v. *Com. Canal Fund*, 2 Abbott's Pr. R.
251; *Hasbrouck* v. *K. B'd of H.*, 3 Keyes, N. Y. 483; *M.
L. Ins. Co.* v. *Supervisors*, 3 Keyes 182; *Messeck* v. *Super-
visors*, 50 Barb. 191; *Brewer* v. *Springfield*, 97 Mass. 152;
*Green* v. *Mumford*, 5 Rhode I. 472; *Merritt* v. *Farris*, 22 Ill.
312; *Jones* v. *Sumner*, 27 Ind. 512; *The Mayor, etc., of Brook-
lyn* v. *Meserole*, 26 Wend. 138; *Van Doren* v. *Mayor, etc., of
New York*, 9 Paige Ch. 387; *Wilson* v. *Mayor of New York*,
4 E. D. Smith, 673; 1 Abb. Pr. 4; *Chemical Bank* v. *Mayor
of New York*, 1 Abb. Pr. 80; *N. Y. L. Ins. Co.* v. *N. Y.*, 1
Abb. Pr. 250; *Livingston* v. *Hollenbeck*, 4 Barb. 16; *Van
Rensselaer* v. *Kidd*, 4 Barb. 18; *Thatcher* v. *Dusenberry*, 9
How. Pr. 33; *Macklof* v. *Davenport*, 17 Iowa, 385; *Dows* v.
*Chicago*, 4 Am. Law Times, 109; Thompson on Prov.
Remedies, 250; *Heywood* v. *City of Buffalo*, 14 N. Y. 451.)

*W. C. Burnett, City and County Attorney of San Francisco,
John L. Love, Attorney General,* and *J. P. Hoge,* also for
Appellant.

Equity will not interfere to restrain the collection of a tax
which is illegal or void merely because of its illegality, but
there must be some special circumstances attending the in-
jury to bring the case within some recognized head of equity
jurisprudence, otherwise the party must be left to his remedy
at law.

If the proceedings are simply void, equity will not inter-
fere.   Nor will it restrain the enforcement of tax proceedings
on the ground of irregularities or errors in the assessment of
the tax, or in the execution of the power conferred upon
taxing officers; in such cases the remedy at law is sufficient.
The mere non-compliance with some direction of the statute,

or where the irregularities relate only to the time in which the different steps were taken, and do not affect the principle of taxation or the groundwork of the proceedings, relief in equity will not be allowed. (*Dows* v. *Chicago*, 11 Wallace, U. S. 108; *Heyward* v. *Buffalo*, 14 N. Y. 534; *Warden* v. *Supervisors*, 14 Wis. 618; *Kellogg* v. *Oshkosh*, 14 Wis. 623; *Green* v. *Mumford*, 5 Rhode Island, 472; *Jones* v. *Sumner*, 27 Ind. 512; *Brewer* v. *Springfield*, 97 Mass. 152; *O'Neal* v. *Vir. & Md. Bridge Co.*, 18 Maryland, 1; *Clinton School District's Appeal*, 56 Penn. St. 317, 318; *Center & Warren, etc., R. Co.* v. *Black*, 32 Ind. 471; *Chicago, etc. R. Co.* v. *Frary*, 22 Ill. 34; *Merritt et al.* v. *Farris et al.*, 22 Ill. 303; *Munson* v. *Minor*, 22 Ill. 601, 602.)

Courts of equity will not interfere with the collection of taxes because of mistakes in judgment on the part of the officers assessing the taxes, and in no case will the collection of a tax be enjoined, when it is not shown that the injury resulting from its enforcement would be irreparable, and this fact must appear in the bill by issuable averments. These complaints make no such issues. (*Leroy* v. *Jackson*, 4 Johr. Ch. 352; *Cowell* v. *Doub*, 12 Cal. 273; *Ritter* v. *Patch*, 12 Cal. 298; *Kelsey* v. *Trustees of Nevada*, 18 Cal. 629, and cases cited above.)

A Court of equity is not a Court of errors to review the acts of public officers in the assessment and collection of taxes, and will not revise their decisions. The law has provided a particular mode and a particular tribunal for the settlement and decision of all errors and inequalities on behalf of persons dissatisfied with the tax, and they must avail themselves of the legal remedy thus prescribed, and will not be allowed to waive such relief and seek in equity to enjoin the collection of the taxes. (*Warden et al.* v. *Board of Supervisors*, 14 Wis. 618; *Macklot* v. *City of Davenport*, 17 Iowa, 385; *Merrill* v. *Gorham*, 6 Cal. 41; *Fall* v. *City of Marysville*,

19 Cal. 393; *Guy* v. *Washburn*, 23 Cal. 113; *People* v. *Arguello*, 37 Cal. 524, and cases cited above.)

The solvent debts secured by mortgage assessed to the said complainant—the Savings and Loan Society—were properly assessed, according to the plain provisions of the statutes. (*People* v. *McCreery*, 34 Cal. 432; *Exchange Bank* v. *Hines*, 3 Ohio St. 26, *et seq.*; 2 Political Code, Chap. 3; *People* v. *Eastman*, 25 Cal. 603; *Livingston* v. *Hollenbeck*, 4 Barb. 5, 6, *et seq.*, and 18; *Falkner, Bell & Co.*, v. *Hunt*, 16 Cal. 167; *People* v. *Arguello*, 37 Cal. 524; *People* v. *Whartenby*, 38 Cal. 461; *Ellis et al.* v. *Linck et al.*, 3 Ohio St. 72.)

It is clearly within the constitutional competency of the Legislature to establish a State Board of Equalization, in the manner and form and with the powers and duties as fixed and provided for in the Political Code, and neither the complaints nor the facts show any ground for interfering with and reviewing their action in the performance of their statutory duties, or for granting any equitable relief to these complainants. To carry out the provisions of the Constitution and secure their object would seem necessarily to require some such body. (*People ex rel.* v. *Salomon*, 46 Ill. 333.)

The objection taken to the action of the Board of Supervisors of the City and County of San Francisco is without foundation. The provisions of the Political Code supersede the provisions of the Consolidation Act in that regard. The Code establishes a general harmonious system of taxation for the entire State, applicable to every county. The Board of Supervisors of the City and County of San Francisco acted under and in pursuance of the provisions of the Code, and were bound by law to do so. If this were otherwise, the mere difference of time when the necessary acts were done, all other things being regular, would not vitiate the assessment and authorize a citizen to enjoin the collection of the taxes. (See cases cited above; Political Code, 2 Annotated, Title 9, p. 3; also, Preliminary Provisions, Secs. 18,

19, 1 Annotated; *State* v. *Conkling,* 19 Cal. 501; *Kellogg* v. *Oshkosh,* 14 Wis. 623; *Christy* v. *Board of Supervisors, Sacramento County,* 39 Cal. 3–10.)

*Creed Haymond,* also for Appellant, after a rehearing had been granted.

The main features of the revenue system established by the Code are: A determination by the Legislature of the amount of money annually to be raised; an assessment of property at its full cash value by Assessors elected by the people of the county or district in which the property to be taxed is situated; the equalization of values, as between individuals, by a county Board, consisting of persons no elected by the people of the district in which the propert, is situated; the equalization of values as between the counties, by a State Board not elected by the people; the fixin, of a rate by the State Board of Equalization sufficient to raise the amount designated by the Legislature; and the collection of that rate by Collectors elected by the people of the district in which the property is situated.

The provisions of the Constitution are: "That taxation shall be equal and uniform throughout the State. All property in this State shall be taxed in proportion to its value—to be ascertained as directed by law. But Assessors and Collectors of town, county, and State taxes, shall be elected by the qualified electors of the district, county, or town in which the property taxed for State, county, or town purposes is situated." (Art. XI, Sec. 13.)

The provisions of the Code and of the Constitution, taken together, we claim constitute a system harmonious in all its parts, tending to the accomplishment of the leading feature of the fundamental law, namely: uniformity—taxation in proportion to valuation.

A Court will not declare a statute unconstitutional unless its invalidity is established beyond a reasonable doubt. But

it is not with the policy of this statute or its provisions that we have to deal. The question presented requires an examination at your hands of the authority of the Legislature to enact the revenue system contained in the provisions of the Code—the exercise of the most delicate power conferred upon a Court—a power, the existence of which was formerly denied in toto by some of the most distinguished public men, and which is never to be exercised except when the conflict between the statute and the Constitution is palpable and incapable of reconciliation.

In the case of *Santo* v. *The State of Iowa*, 2 Iowa Reports, 186, Mr. Justice WOODWARD said:

"For some time after the establishment of the State Goverment it was doubted whether the judiciary possessed authority to declare and hold an Act of the Legislature unconstitutional and void, and the exercise of the power was declined by some Courts. And now, although the power is universally admitted, its exercise is considered of the most delicate and responsible nature, and is not resorted to unless the case be clearly decisive and unavoidable. It is the duty of the Court to give an Act such construction, if possible, as will maintain it."

Said the Supreme Court of Indiana (4 Indiana, 344), in the case of *Maize* v. *The State:*

"Such questions (involving the constitutionality of statutes) are always regarded by the Courts as of serious importance; the judiciary look to the Acts of Legislatures with great respect, and reconcile and sustain them if possible. The General Assembly is the immediate exponent of the popular will, expressly delegated to clothe that will with forms of law. The presumption that such a body has sanctioned enactments in violation of the Constitution is not to be lightly indulged. That the Act is imperfect, or impolitic,

is not enough. These defects subsequent legislation can remove by amendment or repeal. To bring its validity within the control of the Courts it must be clearly subversive of the Constitution."

In *The People* v. *The Central Pacific Railroad Company of California*, 43 Cal. 399, it is asserted in substance, that the legislative power is restrained only by the limitations of the Constitution clearly imposed upon its exercise, and that a statute enacted is not to be put aside by the Courts, unless its conflict with the fundamental law be manifest. For, say the Court, "The deference we owe to the legislative will is only second to that which we owe to the commands of the Constitution, which both the Legislature and the Court are sworn to obey."

In *The Stockton and Visalia Railroad Company* v. *The City of Stockton*, 41 Cal. 162, the authorities bearing upon this proposition are collated and examined. The Constitution does not require valuations to be made by Assessors. The provisions of the Constitution, with which it is claimed the Code, in relation to revenue, conflict, are found in section thirteen of Article XI. That section contains four distinct propositions: First—Taxation shall be equal and uniform. Second—All property shall be taxed in proportion to its value. Third—That value shall be ascertained as directed by law. Fourth—Assessors and Tax Collectors must be elected by the qualified electors of the district, county, and town in which the property taxed for State, county, and town purposes is situated.

We must find the intention of the framers of the Constitution in the language of the instrument itself; and our position is, that the fact that the term "Assessor" is mentioned in the Constitution, does not place the officer beyond legislative control, nor prevent the Legislature from prescribing the duties of the office. We contend that the term Asses-

sor, as used in the Constitution, does not carry with it any definition of the powers of that officer, and that it is left to the Legislature to declare what his powers and duties shall be.   I am aware that this Court in one case intimated that the valuation of property must be fixed, in the first instance, by the Assessors elected by the people, and that a law taking from the Assessors that power, and placing it in the hands of an officer not so elected, would be in violation of the constitutional provision I have referred to.   At the time our Constitution was adopted, there was not within the limits of the State an officer known by the name of Assessor, while by referring to the laws of other States of the Union, we find that the power of fixing the value of property for the purpose of taxation was given under their Constitutions and laws to various officers; officers known by different names— in some States as Assessors, in some States as Commissioners, and in others, by other names; but I believe there is not a single State in which it was ever claimed that the valuation fixed by such officers was final and binding.   The Constitution declares that Assessors and Collectors must be elected.   If the use of the word Assessor carries with it a definition of and fixes the duties of the officer, so the use of the word Collector carries with it a definition of and fixes the duties of the officer.   " Collector " is defined to be one appointed to receive taxes.   Now it must be admitted that if the Legislature could confer upon any other officer the power to collect taxes, it could also confer the power of assessing upon some other officer.   The two officers are put upon precisely the same footing by the Constitution, and whatever can be done in relation to one by the Legislature can be done as well in relation to the other.   (*The Attorney General* v. *Squires,* 14 Cal. 17.)

The Constitution provides for the election, by the people,

of various other officers, among which are the Attorney General, the Controller, Sheriffs, and Clerks. If the insertion of the word "Assessor" in the Constitution carries with it a whole code of laws defining and fixing his duties, and takes from the Legislature the power to alter those duties, or to cast them upon any other officer, the same rule must be applied in the case of a Controller, Sheriffs, and Clerks. We have seen that the term "Assessor" has no fixed meaning, in American law at least. On the other hand, the duties of the Controller were well known at the time of the adoption of the Constitution—an officer exercising the duties of Controller then existed in every State of the Union, sometimes under the name of Controller, sometimes under the name of Auditor. An officer with similar powers has an existence under the Federal Government, under the name of "Auditor," and the duty, in every instance, whatever the officer was called, was to audit and pass upon claims against the Government of which he was an officer. In this State, it has been expressly decided that the Legislature may take from the Controller duties which pertain to his office and devolve them upon another officer, or a Board of officers. (*Ross* v. *Whitman*, 6 Cal. 364.)

The Constitution prescribes that Sheriffs must be elected by the people; yet, would it be contended that the various laws which have been passed in this State allowing the service of summons to be made by persons other than Sheriffs, are unconstitutional, because such duties were formerly devolved upon Sheriffs?

If we are to be held to the rule that the valuation can only be made by some officer elected by the people of the district in which the property is situated, it will follow as a necessary consequence that the action of the County Boards of Equalization have been unconstitutional, and that this Court must now reverse the former decisions sustaining the Legislature by which the County Boards were created. It

is true the Boards of Supervisors, which of late years have constituted the Boards of Equalization, have been elected by the people; but it is also true that they have not been elected by the people of the whole county. Counties have been divided into Supervisor districts—two, three, four, five, and some as high as twelve Supervisor districts—and the members of the Board are elected by the electors of different districts, and yet they pass upon valuations of property in other districts. If the argument be a sound one, that the valuation must be fixed by an officer elected by the people of the district—and cannot be changed by any but an officer so elected—it must be admitted that the whole practice of the State for twenty years has been wrong, and that this Court has during all that time upheld that wrong in the various cases that have been brought here involving the question.

But, turning again to this clause of the Constitution, we see that not only is the Legislature authorized to create a State Board of Equalization, but that the very provisions of the Constitution which are invoked against the power requires the Legislature to establish a tribunal of that character. There are four propositions contained in that section. One of them, that the Assessors and Collectors must be elected by the people, I have already noticed. That is the last clause of the section. A preceding clause requires that all property in the State shall be taxed in proportion to its value; and another clause prescribes that the value is to be ascertained as directed by law.

Now it is a principle well settled in the construction of Constitutions, as of statutes, that the Court must give force and effect to every clause—every word in a given section. If it be true, that under this Constitution the Assessors are to fix the value of property, and that their action to that end is final, what effect can be given to the provision which declares that its value shall be ascer-

tained as directed by law? "All property in this State shall be taxed in proportion to its value, to be ascertained as directed by law." If the action of the Assessor was to be final, what office would any law, directed toward ascertaining the value of the property, have to perform? We say none.

But there is another clause yet—the first clause, which appears to be the leading idea in this whole matter—and that is, "that taxation shall be equal and uniform throughout the State." Now I assert here, that if you apply to the State Constitution the same rule which you apply in the construction of the Federal Constitution—that it is a grant of power—you will still be able to find in this provision the power to establish such a Board. "Taxation shall be equal and uniform throughout the State," says the Constitution. It does not prescribe the rules by which that uniformity shall be reached, nor how the valuations shall be equalized. It leaves those matters to the Legislature; and we say, that here is a mandatory provision of the Constitution binding upon the conscience of the legislator, which requires him, in his capacity as a lawmaker, to establish some tribunal by which the end sought may be attained. "Taxation shall be equal and uniform throughout the State." How would it be possible to attain that equality and uniformity which this Constitution seems to contemplate, if the assessments made by the Assessors are to be final? It would not be possible. The experience of the past has shown that even with the aid of the County Boards of Equalization it could not be attained. So far from having equality and uniformity in taxation, we have had inequality without uniformity. We have had as many bases of taxation, as many different methods of valuation and equalization, as there have been Assessors and Boards of Equalization in the various counties. So that we have learned that a State Board, with power to supervise and harmonize the subordinate agents

is indispensable, in order to carry out the mandate of our fundamental law.

The power to assess does not include the power to equalize. Assuming, for the sake of the argument, what we deny in fact, that the Constitution requires a valuation to be made by an Assessor elected by the people, yet it will not follow that the powers and duties devolved upon the State Board of Equalization are obnoxious to the constitutional provisions. Section thirteen of Article XI of the Constitution, among other things, requires, in relation to the revenue, the exercise of at' least three distinct powers: assessment, equalization, and collection. The mode and manner in which these several and distinct powers are to be exercised—with, at most, the exception that the particular officers who exercise in part the first and last named powers must be elected, etc.—are left to the discretion of the Legislature.

The power to assess is one thing; the power to equalize is another; and the power to collect, still another. But all must be exercised if we are to carry out the provisions of the Constitution. The definition of the word "equalize," given by Webster, is "to make equal; as to equalize accounts; to equalize taxes or burdens." Now this power was never vested in the Assessor in any State. It is a separate and distinct power from the power to assess. It is true that a knowledge of some of the facts necessary to make an assessment may be necessary to make an equalization, but it does not follow that they are one and the same thing. It is only after the duty of the Assessor has been fully performed that the exercise of the power to equalize commences. It is a power intervening between the assessment and collection of taxes—a power the existence of which is recognized by almost every State in the Union. This very question has been passed upon in the State of Illinois, and the power has been affirmed. I refer to the case of *The People of the State*

*of Illinois ex. rel. O. H. Miner, Auditor, etc., v. Edward S. Salomon, County Clerk of Cook County,* reported in 46 Illinois Reports, 333. The provision of the Illinois Constitution, corresponding to ours, is as follows (Art. IX, Sec. 2):

"The General Assembly shall provide for levying a tax by valuation, so that every person and corporation shall pay a tax in proportion to the value of his or her property; such value to be ascertained by some person or persons to be elected or appointed in such a manner as the General Assembly shall direct, and not otherwise."

It will be seen that the Constitution of Illinois, like the Constitution of our own State, provides that property shall be valued, in the first instance, by persons elected or appointed for that purpose—both Constitutions in that respect being substantially the same. On the 8th of March, 1867, an Act to amend the revenue laws, and to establish a Board for the equalization of assessments, was passed by the Legislature of Illinois. The leading features of that Act do not vary from our own law. The reasons which led to the enactment of the statute in that State are similar to those which led to the enactment of our own statute. The validity of the Illinois statute was attacked, and the power of the Legislature to pass it was challenged on the precise grounds urged against our statute.

It will be seen by reference to the provision of our own Constitution that it does not require that property shall be taxed at its actual cash value, but the requirement is that it shall be taxed in proportion to its value, to be ascertained as directed by law.

It was in order to carry out this provision that the State Board of Equalization was created, and power given it to equalize the values as between the counties so that uniformity might be obtained. A State Board does not fix the value upon property; the value is fixed in the first instance

by the Assessors of the respective counties or districts; but the State Board does reduce the rates to an equal standard, so that the same amount of property in Alpine County shall bear the same burden of taxation as a like amount of property in San Francisco.    If authority be needed to sustain the proposition which we maintain is sustained by the very language of the Constitution, that authority will be found in the Illinois case cited, for it is there clearly held that the right to create a State Board of Equalization, with power to review the valuations of the Assessors, is vested in the Legislature; that not only does the power exist, but it is the duty of the Legislature, in order to carry into operation the provisions of the Constitution itself, to create such a Board.

The next point made in this case, and to which the Court seem to attach a great deal of importance, arises, if it arise at all, under section three thousand six hundred and ninety-six of the Political Code:

"At the same time the Board must determine and transmit to the Board of Supervisors of each county the rate of the State tax to be levied and collected, which, after allowing for delinquency in the collection of taxes, must be sufficient to raise the specific amount of revenue directed to be raised by the Legislature for State purposes."

I believe it is admitted upon all sides that it would be competent for the Legislature to say that there should be raised for any given fiscal year a specified sum, and to delegate, if I may so call it, the power to make the computation upon the return of the Assessors so as to ascertain the rate percentum necessary to raise that amount.    But it is contended that the provision in this section which allows the State Board of Equalization to take into consideration the fact that there might be a delinquency, in computing the rate of tax necessary to produce the sum specified by the Legislature, is unconstitutional, because it is a delegation of

legislative power. We are not here to deny the proposition, broadly asserted upon the other side, that the legislative power cannot be delegated. We admit that a power conferred upon an agent, because of his fitness and because of the confidence reposed in him, cannot be delegated to another. That Legislatures stand in this relation to the people whom they represent, cannot be doubted.

We maintain, in the first place, that in the section under consideration there is no delegation of legislative power to the State Board of Equalization. The legislative power is the authority under the Constitution to make laws, and to alter or repeal them. Is there any delegation of such an authority here? Was not this law perfect and complete when it emanated from the law-making power? Does this section confer upon the State Board of Equalization any power or authority to make laws? We say no. It is true that there is a discretionary power vested in the Board by this section, but it is not a power to say what the law shall be; it is a power to ascertain facts, and to apply the law to them. Under the system formerly existing in this State, the Legislature fixed the rate of taxation in advance of the annual assessments, and it was utterly impossible that the Legislature should or could know the amount necessary to be raised. The inevitable result was, that either a greater or a less amount of money than the exigencies of the State required was raised. Under the present system, the Legislature first fixes the amount necessary to carry on the operations of the State government at a sum certain. The assessments are then made, a return made to the State Board of Equalization of the amount of taxable property in the State, and by a mathematical calculation the Board ascertains the rate necessary to raise the amount required by the Legislature, taking into consideration the fact that expenses are incurred in the collection of the revenue, and that in the nature of things there must be delinquencies.

In fixing that rate the Board estimates as near as may be the expense of collecting the revenue and the amount of the delinquency, and fixes a rate sufficient to raise a net sum equal to that required by the Legislature. The Legislature leaves to the Board the determination of a question of fact which it could not possibly determine itself, and it is claimed that this is a delegation of the law-making power. The learned counsel for respondents have not cited any cases which sustain the theory contended for by them, but we are referred to numerous cases in the different States which assert the principle that the law-making power cannot be delegated. Upon a review of those cases, however it will be found that in none of them is there involved the question presented here. They are of that class of cases in which the question presented was, whether it was competent for the Legislature to pass bills authorizing the people of various localities to decide the question of the location of county seats; of whether public schools should be maintained or not; and, in some of them, the question as to whether it was a delegation of the law-making power or not turned upon the form of expression used in the Act. A distinction was taken between an Act which prescribed that it should have the force of law after a vote of the people of the locality in the affirmative, and an Act which, in form, was a law when passed, but depended for its enforcement upon the action of the people of a locality—a distinction which turned upon the form and not upon the substance of the Act; a distinction which, we think, is one without a difference. (*Hobart* v. *The Supervisors of Butte County*, 17 Cal. 24.)

*J. P. Hoge,* also for Appellant.

I have looked into the Constitutions of Arkansas, Florida, Illinois, Indiana, Kansas, Louisiana, Michigan, Minnesota,

Mississippi, Nebraska, Oregon, Tennessee, South Carolina, Texas, Virginia, West Virginia, and Ohio—seventeen States—and find that they all require, by provisions almost identical with our own in this regard, that all taxation shall be equal and uniform. Not only is that the case, but it is the settled doctrine of American law and practice, and is the practical construction of every Constitution that has ever been adopted in this Union, that taxation should be levied with reference to equality and uniformity. It is American constitutional law. Now, of those States that I have named, I have been able to look into the legislation of Florida, Illinois, Indiana, Kansas, Minnesota, Michigan, Oregon, Ohio, West Virginia, and Louisiana—ten States— and I find that they uniformly tax credits as we do, with more or less variation or allowance. That is not all. I have looked into the legislation of States which have no particular constitutional provisions bearing upon this ques- tion, and I find that they have uniformly done the same thing—Kentucky, Maine, Iowa, Connecticut, Massachusetts, New York, Maryland, New Jersey, New Hampshire, Mis- souri, Wisconsin, Georgia, Alabama—thirteen States. Thus we find twenty-three of our sister States, into whose legisla- tion we have had an opportunity of looking, follow the system which California pursues; and I think that I hazard nothing in the assertion that if we could look into the legis- lation of every State in this Union, we would find that there is not a single State that does not tax property of this de- scription in the same way that we do. No case has been cited here, nor, I apprehend, can be cited, which holds such legislation to be unconstitutional, or violative of cor- rect principles, or capable of being attacked by any con- struction of any constitutional provision, I do not care upon what theory their system of taxation may be based.

Next, upon the other branch of the proposition as to the delegation of legislative power, supposed to be included in

the power to fix the rate of taxation, I have been able, in
the short time allowed me, to. look into the legislation of
only a few States besides our own upon the subject.   It
will be seen from the review I have already made of legis-
lation in the State of California, that it cannot be questioned
that this power has been uniformly given in this State to
county authorities for county purposes.   The law in ques-
tion has undertaken to give it to State Boards for State pur-
poses, and to County Boards for county purposes.   Whether
this is any sense a delegation of legislative power is a
question which will come up hereafter.   At present it is
simply a question of what is legislative practice.   Now, in
the State of Illinois, with a similar Constitution to our
own, they constantly delegate the power and the duty to
fix the rate of taxation—in some instances to the Governor,
Auditor, and Treasurer together, in others to the Governor
and Auditor, and in some of their legislation the power is
given to the Auditor alone.   Of course I am familiar with
that legislation, because I came from that State.   The power
has always been so exercised from the foundation of the
State government.   In Florida they give it to the Control-
ler, a constitutional officer, I presume, under their Consti-
tution; whether he is or not I have not ascertained.   In
Iowa they give it to the County Boards of Equalization
and to the State Board of Equalization, as we do; and
Iowa has the same constitutional provision precisely as the
provision cited from the Constitution of the State of New
York, in the case of *The People* v. *Supervisors of Kings
County,* which was decided recently by the Court of Ap-
peals of New York, and which was supposed to have a
bearing upon this case.   In relation to that case, I will say
that, with the same constitutional provision precisely, letter
for letter, no Court in Iowa has ever attempted to hold that
such a legislative provision was unconstitutional and void.
In the State of Iowa they have had that provision always in

their Constitution. It got into the Constitution of New York in 1846, and was, no doubt, aimed at a particular evil. Although the Court, in delivering the opinion, assumed that this was the first instance in which such a delegation of power was ever given in a tax law, yet it was demonstrated by a Senator on the floor of the Senate of that State that there were six laws within four years passed by the Legislature of the State of New York doing that very thing, and the dates, volumes, and pages were cited; so that when the Court made that decision, although they may have been perfectly correct in expounding their own Constitution, upon which they decided alone, and upon a provision which does not exist in our Constitution, they were yet so ignorant of their own legislation that they asserted that that was the first instance known in the State in which such a provision was ever placed in a tax law ! It only shows that, although Supreme Courts are constitutionally supposed to be infallible, the fact does not always bear out the constitutional idea. In Georgia they give this power to the Governor, assisted by the Controller General.

In the former argument of this cause one of the Justices asked if this power could be given to the Governor. I said I thought it could. I did not have the authorities before me, but answered that I thought it could. I find that the very thing which his Honor the Justice suggested, by way of inquiry, is done in Illinois, in Florida, and in Iowa, without question. I shall not go into this legislation, although I have it here abstracted. It will be found to be almost identical with our own.

No State has ever held that such a delegation of legislative power—if it is to be styled a delegation of legislative power—is unconstitutional. I find no such case; and the only case that is cited and relied upon is this case in New York, which depends upon their own constitutional provision. I shall contend, presently, that there is no such dele-

gation of legislative power in these provisions of this law, as violate any constitutional principal. I do not think this doctrine, which the counsel contend for, can be sustained by authority or reason. It is under these circumstances, and in this state of the legislative and judicial history of our own and other States, that the questions, involving the constitutionality of our existing revenue laws, are presented. The constitutionality of the law under investigation, it seems to me, receives irresistible support from the universal practice, under whatever constitutional provisions, so far as we have been able to ascertain.

I come now to discuss the particular propositions which have been made in relation to the constitutional validity of the legislation in question. As I understand the arguments of counsel who have addressed the Court, the main objections which have been presented, and to which the argument has been directed, are these: That the revenue law, in establishing a State Board of Equalization, violates, first, the provisions of section thirteen, Article XI, of the Constitution, in relation to taxation, in giving to that Board, as is supposed, powers that belong to the Assessor to be elected by the people; second, the provisions of the third and fourth Articles of the Constitution, in relation to legislative powers, and that it attempts to delegate from the legislative body to that Board certain legislative powers. The third Article, as you will recollect, divides the powers of the Government into three departments—legislative, executive, and judicial—and provides that neither shall exercise the powers of the other. The fourth Article provides that legislative power shall be vested in a General Assembly; and, third, that the taxation of solvent debts is double taxation, and therefore renders the tax void, as also violating the equality and uniformity required by the constitutional provisions of section thirteen, Article XI.

These are the general questions, shortly stated, as I understand them, which have been discussed. As we have already seen, the general taxing power of the State covers all subjects, and is not limited to property only, whatever may be the definition of the term. The only limitation upon the power is equality, uniformity, and where property is to be taxed Assessors shall be elected; that property shall be taxed in proportion to its value—that value to be ascertained as directed by law. Outside of these restrictions the power is supreme. As to the means and manner, the mode, the form, the shape, in which the power shall be exercised, the Constitution is silent. Keeping within the particular restrictions, all else is of legislative cognizance.

In our American forms of government, by written Constitutions, the provisions are of an exceedingly general character, and are almost entirely mere enunciations of fundamental principles, supposed to be the distinguishing characteristics of a republican form of government. A general chart of power is laid down, with very little detail. This was the great object, and it is only of late years that the nature of legislative powers, of governmental action, the objects and purposes to which it should be directed, the mode, and means, and manner in which the sovereign power should be restrained and limited, and confined to purposes and objects consistent with an enlarged idea of public liberty and private rights, have become the subjects of so much discussion, both in legislative and constitutional assemblies.

Now, the cardinal object of all constitutional construction is to advance, to secure the harmony, the consistency, the purpose, the design, not only of its several provisions, but of the whole, so as to carry out the powers, the duties of a Government, intended to last for all time, to protect and advance all the great interests of a State. It is the chart of a Government, and not to be technically, narrowly construed, and confined to the destruction of its power for good—the

destruction of the very object of all Constitutions—to give to the Government the power to protect the liberties of its people; to protect and secure the rights of property and of individuals. Our Constitution, framed in accordance with this idea, gives to the Legislature power over the whole subject of values, of equality, of uniformity—gives to the Legislature the power to provide means of ascertaining the information necessary to comply with the constitutional requirement of equality and uniformity.

This is the great leading idea, not only of our Constitution, but of all American forms of government. When our Constitution provides for the election of Assessors it provides for one of those means; it employs one of those agencies which is within the power of the State to use in order to acquire the necessary information upon which it is to act in securing the equality and the uniformity that the Constitution demands. But that is only one of the means, one of the instruments which may be used. We must construe it according to its language, and its very language shows that the Constitution gives to the Legislature the whole subject; the whole means by which shall be secured that equality and that uniformity over the whole State, in every section or portion of the State; over those smaller subdivisions of the State Government, the counties, cities and towns—for the subdivisions get all their power from the legislative authority as a portion of the State; as an instrument of the State—as a means of carrying out the great duties imposed upon the Government of the State by the provisions of the Constitution. They are one of the means by which the legislative body operates over the people of the whole State. This great power was confided entirely to the Legislature. Valuation is only one means of attaining the great end in view; it is not the thing itself. Ours is not a system of taxation based upon valuation. It is a system of taxation based upon uniformity, equality between all sections of the State,

and over the people and property of the State; and the valuation is but a means to carry out the constitutional provision; nothing more nor less. To hold otherwise, is to emasculate the Government of the power to carry out its duties under the Constitution; to deprive it of all means of arriving at the very cardinal end that all constitutional means aim at. All these means, modes, and manners are but subsidiary to the great leading and central idea of the Constitution itself.

To carry out the argument on the other side to its legitimate and necessary conclusion, where would it lead to? The whole power of taxation over the property of the State would be left to the Assessors. Elected by the different subdivisions of the State for the purpose of valuation with a view to taxation, they would control, without limit and beyond the reach of any legislative action whatever, the whole subject of taxation. This would be the result if the argument advanced on the other side is to be sustained. The argument of necessity presupposes that the action of the Assessor is final and conclusive upon all branches of the Government. It goes to this extent, and it cannot stop short of it without yielding up the whole question; and my learned friend, Judge BENNETT, with his accustomed directness, immediately assumes that as the true proposition. He argued that the power does go to that extent, and the very necessities of his argument compelled him to assume the position that the action of the Assessor is beyond the reach of legislative control, or of control by any means whatever.

Is there any provision in the Constitution which renders the action of the Assessors final and conclusive? If there is not, the whole question is yielded. I ask your Honors, whence comes the power of the Legislature to give the County Boards of Supervisors the right to interfere with or control the valuations made by a constitutional officer, who, as is claimed, is elected for that purpose, and who alone has

the power of assessing? That officer is the Assessor. The argument assumes that the Assessor is the constitutional officer to whom is committed the subject of valuation for the purpose of taxation, and upon that theory his action is of necessity final, and can no more be controlled by legislative action through a County Board than through a State Board. The Constitution provides for the officer, and the Legislature carried out the constitutional provisions at the very first session of the body convened after the adoption of the Constitution, by providing for the election of Assessors, and for the duties of Assessors. We have, then, the officer provided for by the Constitution and established by law, and how are you going to get any control over his action, upon the theory of the learned counsel? For we are now treating of this question upon his theory as to the restriction of legislative power. The whole subject of valuations belongs to the Assessor elected by the people, says the counsel, and no power to inquire into or interfere with his action is lodged anywhere. That is the inexorable result of his argument. It forces him to that conclusion, to that position, and without it there is nothing in the argument one way or the other.

The idea of the Constitution is, of course, that this equality and uniformity shall extend to the whole State; that no part of the State shall have any advantage over another, but that all shall work harmoniously to the same end. Experience in this and other States shows that such a result cannot be accomplished by local Assessors alone. To admit that the Legislature can authorize County Boards of Equalization—no matter how the members of such Boards are appointed (for I contend that the provision in regard to elections has no bearing upon this question), yields the whole question. It is of no consequence whether the Board to whom the counsel claims the power is delegated, is elected,

or appointed; the object of creating Boards of Equalization is to control the action of the Assessor—the action of a constitutional officer; and he is as much beyond the reach of a Board whose members are elected as of one whose members are appointed. It is attempted to show that, under the constitutional provisions in relation to the establishment of town and county governments and the election of Boards of Supervisors, the Legislature might give to County Boards the right to control the action of the Assessor and to review his valuations. I apprehend there is nothing in that position at all; such provisions have no bearing upon the question as to the power of the Legislature to go back of the action of the Assessor. If the argument that the Constitution gives the Assessor the whole power of assessing be correct, his assessments must be final and conclusive. Whence comes the power, then, that has been conferred upon the County Boards of Equalization? This Court has always sustained the validity of such Boards and of their action upon the valuations of the Assessors when illegally or imperfectly made. How can the exercise of this power be reconciled with the Constitution, except upon the theory that the whole subject of taxation, the valuations of property, the manner, the time, and all the proceedings necessary to meet the requirements of the Constitution, are subject to legislative control?

I repeat it, then, that the uniform practice of the Government, the provisions of the Constitution, the necessary functions of government, are opposed to the theory of the learned counsel. The powers of the State Board of Equalization, as given by this law, are directed towards and confined to the valuations made by the Assessors. The assessments must be laid before the Board, and upon such data they must so equalize the valuations as to secure equality and uniformity throughout the State. The object is to secure equality and uniformity in taxation; the data to be acted upon is the valuations made by the Assessors; and the Board is merely

the instrument used to attain the object. That object lies at the foundation of the constitutional provision on this subject, and the legislation of this State has been uniformly consistent with it. The argument that this law attempts to give the Board power to assess is utterly unfounded. They have nothing whatever to do with fixing the valuations in the first instance. They cannot assess any property. They do not deal with the property. They act upon the valuations already made by the Assessor. In this regard they have but one duty to perform: they examine what the Legislature requires to be placed before them—the assessment rolls of the different counties, prepared by the constitutional officers; the description of all the property in the State, with the names of the persons who own it—in order to see that the assessments in the different portions of the State have been made upon correct and like principles. It is their duty to see that the Assessors all follow the same rules; to see that while the Assessors in one section of the State proceed upon a correct plan, the Assessors in other sections shall not follow other and erroneous rules. Thus, the Board is to secure justice to all taxpayers—equality and uniformity of taxation throughout the State. Thus they are to prevent what the Supreme Court of Illinois, from the case cited here, from the forty-sixth volume of Illinois Reports, characterize as "gross inequalities," "monstrous evils, inflicting injustice upon the individual property owner, and robbing the treasury of the State of its just revenue." There, the Court say that if the Legislature have no power to correct such great evils, it is indeed "a feeble instrument, and the sooner it is overhauled, and its weak places strengthened, the better." Without a State Board of Equalization here, the same thing would exist in this State. The object, then, of our Constitution was, not to increase taxation nor to reduce taxation, not to give this Board any power over the subject of taxation, but merely to equalize the assessments so that there shall be a

harmonious and equal system of valuation, applicable to all the property of the State. That was the whole object, and there is nothing in the law whatever which gives the Board any power over taxation.

The same requirement of the Constitution is applicable to taxation for counties, towns, and cities, as for the State. The same equality and uniformity is required in one case as in the other. According to all the authorities, the Legislature can no more authorize equalization for a county than it can for the whole State. A county is a municipal corporation having subordinate legislative powers for local purposes. It is created by the Legislature, and derives all its authority from that source. Certainly the Legislature cannot authorize its creature to do a thing which the creating power itself has no authority to do. The Board of Supervisors can do nothing but what the law authorizes them to do.

Now, in the case of *The People* v. *Salomon*, 46 Ill. 333, which the counsel has not even deigned to notice at all, the Court discusses this question of equalization upon constitutional grounds, and reaches the conclusion that it is not only right, but that it is within the constitutional power of the Legislature to establish a State Board of Equalization, and that it was absolutely essential to do so in order to carry out the mandate of the Constitution to secure equality and uniformity. No case has been cited to the contrary, and no case can be cited. It is well known that in every State in the Union the same inequalities have followed where there has been no State Board of Equalization. There is not a State in the Union that does not establish in some form or other a Board of Equalization to secure that equality and uniformity recognized as necessary, either in so many words in the Constitutions, or by the practical construction of the Constitutions of all the States. If there had been any such case, the learned counsel would doubtless have found it out and cited it here. My conclusion is that there is no such

case.    I have searched very industriously to find such author-
ity, but I have not found a single case where the constitu-
tional right of the legislative body to provide the means,
and the mode, and manner of taxation, so as to secure uni-
formity and equality, has ever been questioned by a Court
of justice; yet I know the power has been exercised from
the foundation of this Government to the present time.

I understand that it has been admitted in the argument—
I think it is so admitted in the petition for the rehearing,
and certainly it was admitted in the former argument—that
it would be perfectly constitutional—would be no delegation
of legislative power—if the Act simply authorized the fixing
of a rate sufficient to raise a given sum.    It will be my busi-
ness to show that nothing more than that power is given,
and nothing more has been done than the Legislature have
been in the uniform habit of authorizing the inferior subdi-
visions of the State Government to do.    They have uni-
formly required Boards of Supervisors to levy taxes within
particular limits, and to fix rates necessary to produce the
amounts desired to be raised.    The statute books are full of
such provisions, and I do not understand the counsel on the
other side to question this power.    Now, I admit that the
taxation must originate with the legislative power; and I
think the proposition has that extent, and no more.    That is
equally true of every political division of the State, as much
so as of the State at large.    This is the correct principle,
and it is so laid down by Cooley, on pages five hundred and
seventeen and five hundred and eighteen of his work on
" Constitutional Limitations."    That is as far as the propo-
sition ever did go: that the power of taxation must always
originate with the Legislature.    How it shall be carried out,
what agencies shall effect the design of the State, I never
understood to be questioned by anybody, until the argument
of this cause, as properly belonging to the legislative power.
At least, I have not been able to find any case that does go

to any such extent, except the New York case, of which I have been speaking, and that was decided upon a peculiar constitutional provision. Sections thirty-six hundred and ninety-six and thirty-seven hundred and thirteen of our Political Code show the extent of the power that has been given to this State Board of Equalization. Section thirty-six hundred and ninety-six provides "at the same time the Board must determine and transmit to the Boards of Supervisors of each county, the rate of the State tax to be levied and collected, which, after allowing for delinquencies in the collection of taxes, must be sufficient to raise the specific amount of revenue directed to be raised by the Legislature for State purposes." Section thirty-seven hundred and thirteen provides that " the State Board of Equalization must, for State purposes, for the twenty-fourth and twenty-fifth fiscal years, fix such an *ad valorem* rate of taxation upon each one hundred dollars value of taxable property of this State, as will raise for each of said years " the sums specified therein, amounting in the whole, together with other amounts required to be raised, to two million three hundred and seventy-two thousand dollars. This is the power which is given to the State Board, and the only part that is questioned is that which says, after allowing for delinquencies, they shall ascertain the rate of taxation necessary to raise the amount required.

Now, it is perfectly apparent, in the first place, that this Board has no discretion as to the amount to be raised. They are to raise what the Legislature directs them to raise and put into the treasury—so many thousands of dollars. It seems to me to be very apparent that the only operation the State Board performs is simply to make an arithmetical calculation, after they have ascertained the amount of property upon which taxes can be assessed, of the percentage necescary to raise the given amount. That is all that is delegated to it. They cannot go a step further under the law. They

are to raise two million three hundred and seventy-two thousand dollars for particular purposes.   How are they to get at it?   The Legislature instructs them, by the various provisions of this Act, how to do it; instructs them to examine all the lists of property in the State, to see what can be collected; to equalize the assessments throughout the State, so that the tax may be equal and uniform, and when they have got to the true value of property they are to make the calculation.   Now, suppose the word "delinquent" had been left out entirely, and the section had just read thus (3696):   "At the same time the Board must determine and transmit to the Board of Supervisors of each county the rate of State taxes to be levied and collected, which must be sufficient to raise the specific amount of revenue directed to be raised by the Legislature for State purposes."   What would have been the operation of it?   How would they proceed to raise the amount demanded?   By precisely the same process.   No other rate was ever fixed in any other way by anybody, either by the Legislature or anybody else.   You must first ascertain the value of the property to be taxed, and you must then see what will be the delinquencies in payment, whether the law says so or not.   If that is not the whole operation, I am unable to understand the language of this law.   Heretofore the Legislature has been in the habit of receiving the estimates of the Controller of State.   When they were about to pass a law to levy a tax they took his estimates to see how much was required.   Then taking his returns of what was supposed to be the taxable property throughout the State, they fixed a percentage that was certain to raise the revenue required, after deducting the delinquencies.   The whole experience of the Government from its foundation shows that the returns invariably fell short about eighteen or nineteen per cent.   As a matter of course, allowance must be made for that, in order to realize the amount required.   That has been the practice heretofore.

It was an uncertain practice, because the Legislature was operating without sufficient light on the subject. They then passed this law, intending to adopt another system, which does not yield any legislative power, but by law authorizes the taxation, and prescribes the mode, manner, and form in which the calculation as to the rate shall be made. After passing the law authorizing the taxation, and fixing the amount they desire to raise, the Legislature directs these agents to perform the duty which the Controller had heretofore performed; to ascertain what was likely to be lost in the collection, and then, making allowances for that, to determine what percentage will raise the amount the State desires. That is the whole of it. If you can make out any delegation of legislative power in that Act, I am unable to understand the term. What has been the result? It appears in the record in this case, and it was put in evidence, that up to the time of trial of this cause, there had been collected two million and seventy-nine thousand dollars. There is about one hundred and seventy thousand dollars tied up in these cases. There is one hundred and seventy thousand dollars here of the two million three hundred and seventy-two thousand dollars that they were directed by the Legislature to collect. Now, that is the fact, and that is the whole fact. So it appears that the Board have not levied one dollar more than they had a right to levy, and they have not collected one dollar more than they ought.

*John B. Felton,* for Respondents.

The proposition upon which we rely to show that the tax on solvent debts is unconstitutional, is this: that solvent debts are a species of property, which, under the system of taxation adopted in California, is taxed under another name, and, consequently, cannot be again taxed. We concede fully that solvent debts constitute property, and, under a different system of taxation than that adopted in California,

can be taxed, under the name of solvent debts, to the creditor, or person who owns them. But we contend that the State, for its own convenience, has adopted a system of taxation *in rem*, and not a system of taxation *in personam*, and that, by consequence, it has taxed in the hands of the debtor all the things in his possession, whether real or personal property, without making any deduction therefrom for his debts. In other words, it has taxed in his hands a value exceeding the amount of his property by precisely the amount he owes to his creditors. Now, evidently, if no dedution is made to the debtor for what he owes, he has to pay the tax on that very amount which he owes to his creditors. To make the creditor pay the tax on the amount which the debtor owes him, and on which amount the debtor has already paid his tax, involves the taxing the same property twice, three times, four times—in short, an indefinite number of times its value.

To illustrate: Suppose A. has a stock of goods worth one hundred thousand dollars, constituting his sole property, and has given to B. a note secured by a mortgage on this stock for eighty thousand dollars, and B. has no other property than this note and mortgage. B. has given to C. the note and mortgage of A. as collateral security for B.'s debt to C. of sixty thousand dollars, and C. has no other property than this note and mortgage. C., on the other hand, has given to D. B.'s note and mortgage to secure C.'s indebtedness to D. of forty thousand dollars, and D. has no other property than C.'s obligation to pay him forty thousand dollars. Now, in this case, we have the following state of facts: A. has a stock of goods worth one hundred thousand dollars; but A. himself is only worth twenty thousand dollars, being the excess of the value of his stock of goods over his indebtedness to B. of eighty thousand dollars. B. is the owner of a

solvent debt of A. to the amount of eighty thousand dollars; but then B. is only worth twenty thousand dollars, because he owes to C. sixty thousand dollars. On the other hand, C. has in his hands a solvent note of B. for the sum of sixty thousand dollars; but then C. is only worth twenty thousand dollars, because he owes to D. forty thousand dollars; and, finally, D. is worth forty thousand dollars because he has a solvent debt for that amount, and owes nobody anything. Now, it is clear that these four persons, A., B., C., and D., all taken together, have in the aggregate only one hundred thousand dollars worth of property. The whole value which they have is the one hundred thousand dollars worth of stock in A.'s hands. It is out of this stock of goods that A. must pay B., and B. must pay C., and C. must pay D.

If you were to destroy by fire the stock of goods of A., the notes of B., C., and D. would become valueless. So, also, it is clear that when A. sells this stock of goods for one hundred thousand dollars, and collects the money, he will keep twenty thousand dollars for himself and pay to B. eighty thousand dollars; B. will retain twenty thousand dollars, and pay to C. sixty thousand dollars; C. will retain twenty thousand dollars, and pay to D. forty thousand dollars—and thus the entire indebtedness of A. to B., B. to C., and C. to D. will be extinguished. It is also evident that if we tax in the hands of A. this stock of goods for its full value without deducting therefrom A.'s indebtedness to B., we will tax not merely what A. owns, but also the property of B., C., and D., which consists of an interest in A.'s stock of goods; for A.'s stock of goods is the fund out of which the notes of B., C., and D. are to be paid. But if, on the other hand, we should tax in A.'s hands his stock of goods for the full value, one hundred thousand dollars, and then in B.'s hands A.'s promissory note for eighty thousand dollars as a solvent debt, and then in C.'s hands B.'s promissory note for sixty thousand dollars as another solvent debt, and then in D.'s

hands C.'s promissory note for forty thousand dollars as a
third solvent debt, we should have this result:   .

The tax on A.'s stock of goods for.............. $100,000
The tax on B.'s solvent debt....................   80,000
The tax on C.'s solvent debt....................   60,000
The tax on D.'s solvent debt....................   40,000

Total............................ ............ $280,000

So that we should have a tax on a valuation of two hun-
dred and eighty thousand dollars, when there is in existence
but one hundred thousand dollars of real value—that is, the
stock of goods of A.   It is also evident that when you have
taxed in the hands of A. the one hundred thousand dollars
worth of stock, you have taxed not merely the property of
A., which is only twenty thousand dollars, but you have also
taxed the twenty thousand dollars which is the property of
B., and the twenty thousand dollars which is the property of
C., and also the forty thousand dollars which is the property
of D.   So that A. has to pay not only his own tax, but the
tax of B., C., and D.

It would appear at first sight that making A. thus pay the
tax not only on his own property but also on that of B., C.,
and D.—the making of a man who is only worth twenty
thousand dollars pay a tax on five times the amount of his
own property—would be unjust, hard and unequal; because
it would make A. assume all of B., C., and D.'s burdens.
But we will show that A., in thus paying the tax of B., C.,
and D., is only obeying an inexorable law of political
economy, which is that the consumer must ultimately pay
all the taxes on the thing consumed. · Thus, if I smoke a
cigar, I must pay all the taxes on that cigar from the time
the tobacco seed was planted till the cigar seller gave it to
me over the counter.   And so, if I wish to use money, I
must pay to the money lender, not as a part of his profit, but

as a part of the actual cost of the money itself, the taxes that are levied thereon.

There are two systems of taxation which are equally constitutional, which lead to the same result as for as valuation of property is concerned; but which differ in the facilities which they furnish in the collection of taxes. We will call one of these systems the "in personam" system; the other the "in rem" system. The "in personam" system consists in taxing the taxpayer directly on the value of his property, or, in ordinary language, on what he is worth. Now, a man is evidently worth the excess of the value of his assets over the amount of his debts. Thus, if a man has a million worth of property in his hands, but owes half a million dollars, he is evidently worth only five hundred thousand dollars; and if you taxed him for a million dollars without deducting five hundred thousand for his debts, you would be doing an injustice to him; that is, taxing twice as much as he is worth. It is evident, also, if you should adopt the system of taxing the taxpayer for what he is worth, that after you have taxed all the taxpayers in the State, you would not then have taxed all the property within the State, but only that portion of the property within the State which belonged to those who resided therein. You would not reach by this system the property of non-residents. But under this system you would not tax solvent debts twice; because when you had taxed the debt in the hands of the creditor, who owned it, you would make a corresponding deduction to the debtor. If, then, this system were pursued, there would be no double taxation. Solvent debts would be taxed in his hands, whose wealth they constituted; but they would be deducted from the value of the assets of the debtor, who might be obliged to pay them. This system, to the minds of many, who do not examine profoundly the subject of taxation, seems more just than the other system, which we shall explain hereafter; for under it the

millionaire is evidently taxed for his millions; and, apparently, the rich man does not escape the burden of taxation. But, as we shall show hereafter, this is only an appearance and a fallacy. The rich man no more escapes taxation under the system adopted in the State of California than he would escape if the tax were laid directly on what he is worth.

The second system of taxation is what we have called the tax *in rem;* and it consists in taxing all the property within the State, without regard to the persons who own it, or are interested in it—the State leaving to the individuals who are interested in property the apportionment or arrangement of the taxes between themselves. Under this system the tax is laid directly on all the things that constitute the wealth of the State, whether those things consist of lands, or animals, or growing crops, or merchandise, or goods in warehouse, or money, or furniture, or stocks in corporations—in short, all the real and personal property is directly taxed. Thus, under this system, land is taxed as a thing from the bottom of the earth to the top of the heavens. It is very evident that if this system is carried out, the entire wealth of the State will be reached. Everything within the borders of the State—all the property that the laws of the State protect—will be taxed. It is evident also that when, under this system, a thing as such is taxed, the interests of all those who have any interest or property in that thing will be taxed. Thus, personal property may be pledged or mortgaged; but if you tax the thing itself, you tax not merely the interest of the owner of that thing, but also the interest of pledgee and mortgagee therein. So, also, under the great subdivision of land are comprehended many interests owned and held by many different individuals. Thus, a man may have a lease of a piece of land; another an estate for life; another a remainder; another a reversion; another may own the mines under it; another the house thereon; another a mortgage upon the land; but,

under the *in rem* system, the State disregards all these individual interests and taxes the thing itself. So that the owner of the house cannot pay the tax on his house without paying the tax upon the whole land; the owner of the mortgage must pay the tax of the mortgagor—in short, the owner of any interest in that land must, in order to save his interest from a forced sale, pay the taxes on all the other interests in that land. Hence, if I, the owner of a house, were to go to the Tax Collector and offer to pay the tax on that house, he would tell me that a house is a subdivision not known to the revenue laws; that a house is only a portion of a thing called land, and that I must pay the tax on the entire thing if I wish to save my house. And if I were to urge that thereby I would be obliged to pay the taxes of a great many other people, which would be unjust, he would answer that the State had nothing to do with that; that the proportion which each one who has any interest in this land must pay, must be adjusted among the parties interested, either by a sense of what is right, or by a contract; that the State found the thing within its borders, protected it by its laws, and imposed a tax upon it without regard to the individuals who claimed interests and rights in it.

The Legislature of the State of California has adopted the mode of taxing *in rem* for many good and valid reasons:

First—If the individual alone were taxed for what he is worth, the State would run the risk of losing the tax altogether. The individual, after he were assessed and before the tax were collected, might become insolvent, or might remove his property to another State; while if the tax were laid directly on the thing itself, it would be impossible to destroy the thing; and the greater part of the things which constitute the wealth of the State, cannot be removed therefrom; they cannot escape the tax.

Second—It is difficult to make a summary forced sale of the property of an individual; while if the tax is laid on a

specified thing, that thing can always be identified and sold for non-payment of taxes.

Third—The task of the Assessor in finding out the various relations of individuals to property, would be an almost impossible one; while, on the other hand, it is easy for the Assessor to find out what land, and how many horses and cows, and other articles of property there are in the State, without regard to the individual interests therein.

Fourth—Much of the property of the State of California is owned by persons resident in foreign countries, or other States; and if we taxed the individual alone, it would be difficult to enforce the tax against those non-residents, whereas, if we put the tax directly upon the things of the State, the non-resident must come forward and pay the tax, or else the thing in which he is interested will be lost to him. Thus, if a man in France or England lend money in California on mortgage of real estate, he must see that such real estate pays the full tax, or he will lose his security. Take the case of the railroad, which is mortgaged for many millions to numerous bondholders abroad. If we taxed the railroad company as an individual, we should be obliged to deduct its large indebtedness; but then it would be difficult, not to say impossible, to get at the foreign bondholders; while, by laying the tax directly on the railroad property, we tax not merely the interests of the railroad company, but also the interests of the foreign creditors.

Many other reasons might be suggested to show that a tax *in rem* is more effectual to make every man pay his taxes, more simple, more easy of collection, and more calculated to serve the great purpose of the State, which is to have an adequate revenue punctually paid, than would be a tax *in personam*, or a tax on the value of each individual's wealth.

But can the State, after thus laying its tax directly upon all the tangible things which constitute its wealth, levy

another tax on certain interests which individuals have in those things, which interests are necessarily taxed when the whole thing itself is taxed. Thus, in the case of a solvent debt, the debt is said to be solvent because the debtor has property sufficient to pay the debt. But this property, which constitutes the fund out of which the creditor is to be paid, has already been taxed to its full value, without any deduction for the debt which is to be paid out of it. Now, if the fund out of which a debt is to be paid is taxed, and at the same time the debt itself is taxed to its full amount, you have clearly taxed that debt twice. You have once taxed its amount in taxing the fund out of which it is to be paid; that is, the property in the hands of the debtor; and you tax it again in the hands of the creditor. Analyze for a moment the relation of debtor and creditor. The creditor has a right to take from the debtor an amount of his property equal to a certain sum. Now, this very amount of the debtor's property, which the creditor has a right to take by virtue of the debt, you tax in the debtor's hands. In other words, the portion of the debtor's property, which he has agreed to deliver to the creditor, is taxed in the hands of the debtor. Is it not clear that when the debtor complies with his engagement, and delivers over to the creditor that portion of his property which the debt calls for, he delivers to the creditor a value which has already been taxed? When, then, the creditor is called upon to pay his tax on that solvent debt, his answer is: "The tax on that very debt has been paid by the debtor. The debtor had a certain property in his hands, out of which I had a right to receive a certain amount; and the very amount which I had a right to receive was taxed in his hands before it came into mine. Can you make the same property pay two taxes in a year, when other property pays only one tax?"

Now, where is the fallacy here? Is it not very clear that when the law taxes in the hands of the debtor his whole

property, without deducting his debts, it has taxed the very amount which the debtor is to pay to his creditor, and that when the debtor pays the creditor the amount for which he has been already taxed, the creditor receives from the debtor a portion of property which has once performed its duty to the Government? Is it not clear that if you tax the amount of the debt to be paid in the hands of the debtor and the same amount in the hands of him who is to receive it, the creditor, you have imposed two taxes on precisely the same value?

Where is the right to impose these two taxes? If a piece of land has once been taxed for a certain fiscal year, I apprehend it would not be contended that it could be taxed again. Nor, if under the name of land a house or a lease had been taxed as a portion of the land, could the same house on the same land be taxed again.

The Constitution, which prescribes that all property shall be taxed according to its value, prohibits just as much the taxing property for twice its value as it does the taxing it for half or a third of its value. Besides, the tax is unequal and not uniform; for you tax the solvent debt twice—once in the hands of the debtor and once in the hands of the creditor; while all the other things, such as lands, horses, cattle, etc., you only tax once. Can a law be constitutional in California which enacts that a certain property, viz., solvent debts, shall pay two taxes a year, but that all the other property shall pay only one tax?

But, it is said, the creditor cannot complain because you admit the solvent debt in his hands is property. His property, it is said, has only been taxed for its value; he has no right to complain; if any one has a right to complain, it is the debtor who is taxed for an amount more than he is worth by the very amount of his debt. I have admitted fully that

a solvent debt is property and should be taxed.   It is, in my opinion, absurd to say that a man who has a million of dollars in solvent debts is not worth a million of dollars, and that this value should not be taxed.   But must this value be taxed in his hands and to him?   If so, then our whole system of taxing "in rem," of taxing property without regard to the individual interests therein, is unconstitutional.   The owner of a house mortgaged for ten thousand dollars would have a right to say, you have taxed me ten thousand dollars more than I am worth.   The owner of personal property that is pledged or mortgaged would have a right to deduct the amount of the debt for which his property is pledged or mortgaged.   The railroad company would have a right to say I owe millions of dollars abroad; you must deduct those debts from my taxable property.   In short, you would compel the State to simply tax each individual for what he is worth, and no more.   You would have to abandon your present system of taxing the things of the State as such without regard to the individuals who own them or have an interest in them.   You would have to make each individual pay a tax on precisely what he is worth.

We have already seen how impossible it would be to collect a tax on such a system.   But if there is a constitutional right to tax property under the California system, that is, to put a tax directly on its lands, its cattle, its mines, its growing crops, its goods and chattels, then it is manifestly absurd and unjust, after all the property in the State has been once taxed, to say to an individual: "Under our system your debtor was compelled to pay the tax on your property.   You did not pay the tax yourself, but another did.   The State got all it was entitled to get as a tax on your property; but as you yourself did not pay the tax, we insist that you shall pay it, notwithstanding the consequence will be that the State will receive two taxes on the same value."   Would not this be as absurd as for the manager of a theater to insist

that a man whose ticket had been paid for him by a friend should pay the price of admission over again? If property has once paid its tax to the State, it matters not who pays it. It is no concern of the State's that this person or that has paid the tax. The creditor says: "The solvent debts in my hands have once paid their tax; you cannot tax them twice. It is none of your concern whether I paid the tax or the debtor, especially when you yourself, for your own convenience, have adopted such a system as to compel the debtor to pay."

I have admitted that a solvent debt is property in the hands of the creditor, and that if the State taxed the property within its borders to the individuals interested therein and according to the value of their interests therein, such solvent debts would be taxable directly to the owner thereof. So that, if we taxed each individual for what he is worth, we should include in his wealth the solvent debts which he owns. But under the classification of property adopted by the State of California for taxation purposes, the relation of the debtor and the creditor is completely ignored. In the classification there adopted the property of both creditor and debtor in the things constituting the wealth of the State are included in other definitions of property. Thus, under the general definition of land is included the property of all individuals interested therein, whether debtor or creditor. Under the head of consigned goods are comprehended the interests of the consignor and consignee; under the head of personal property are comprehended the things themselves— the furniture, the horses and cattle, the hay and the grain, the growing crops, the railroad, all money, all mining interests; in short, all the things. In other words, property is classified absolutely, and not by its relation to the individual.

Now, it is very evident that by the mode of classification adopted by the State you arrive at a sum total of all the

wealth of the State; and after you have arrived at a sum total of all the wealth of the State, you cannot increase the aggregate of that wealth by merely dividing the same property in a different manner. If by adding together all the value of the things in California you find that the aggregate is a value of five hundred millions of dollars, you cannot increase that value by saying that A. owns five hundred thousand dollars in that property, and that therefore this five hundred thousand dollars should be added to the gross amount of the entire value.

Property may be described in two ways: Firstly, property consists of certain objects, and a list can be made of those objects, and their values attached; and these values added together constitute the entire value of the property; or, secondly, these objects belong to different individuals, and you can get at their value by ascertaining what each individual is worth, and adding these values together. These two modes are evidently but different ways of getting at the same result; that is, the aggregate of the value of all the property in the State. You can say that all the objects in the State are worth so much, or the aggregate of the individual interests in all the objects in the State as worth so much. So, also, you can tax those objects, or you can tax them as individual interests in such objects. But if, after having taxed all the objects in the State to their full value, you tax again the individual interests in those objects, you have evidently taxed the same property twice. Just as if you taxed an orange as a whole, you have taxed all that there is in the orange; and you cannot increase it by subdividing that orange into quarters, or eighths, or sixteenths. So, when you have taxed all the wealth of the State as an entirety, you cannot increase that wealth by subdividing the different objects which compose it by reference to the individuals who are interested therein. Thus the property of the creditor in the solvent debt is property when considered

in reference to himself; but the mere fact that the debtor owes the creditor money, does not add anything to the wealth of the State; it only makes a new subdivision of the property in the State.   Thus the fifty or sixty millions of dollars of solvent debts in the State, do not diminish or increase the aggregate wealth of the State.   Suppose the whole State of California belonged to two persons, so that the two together were worth five hundred millions of dollars.   Now, one of these two, contented with his fortune, sells out to the other, and takes his promissory note for two hundred and fifty millions, secured by a mortgage on the whole.   In that case the purchaser has five hundred millions of assets; but owes two hundred and fifty millions thereon.   By this transfer there has evidently been no additional increase of the value of the aggregate wealth of the State.   It remains five hundred millions—the same as before the transfer.   But under this system of taxing solvent debts, and the property, too, the Assessor would tax the purchaser for five hundred millions after the transfer, and the seller for two hundred and fifty millions for solvent debts.   Precisely as if the transfer of two hundred and fifty millions from one to the other had added that amount to the value of the property.   This, certainly, would be a very easy way for the State to make money.

Then, again, if the purchaser should happen to reimburse the seller the two hundred and fifty millions, the terrible calamity would befall the State of losing a third of its whole property by the mere extinguishment of a promissory note. See what a terrible calamity, on this hypothesis, happens every time the Crown Point mine yields a million of dollars! It is safe to say that such one million of dollars suffices to pay at least ten millions of dollars of debts; for the same money goes from creditor to debtor, and from debtor to creditor, each successive debtor using it to pay his debts. By this unfortunate influx of a million dollars a month the

State would receive a million dollars taxable property, but would lose ten millions by the extinguishment of debts. If this influx of gold and silver went on the State would be unfortunate enough to have citizens rich enough to pay all their debts; and so all the immense property of solvent debts belonging to the State would be lost to it altogether. The extinction of sixty or seventy millions of solvent debts, due by citizens of this State to each other, would, on the hypothesis that these debts constitute property of the State, be a calamity as great as the Chicago fire. And every time a creditor collected a judgment against a debtor he would be destroying a portion of the property of the State. Certainly, to be consistent, the State should pass a stringent law, making it a heavy penalty for any one to wantonly destroy the property of the State by paying his creditors. And the Constitution should be so altered as to read, "All the property of the State shall be taxed according to its value; and after you have taxed all the property of the State according to its value, then you shall add to that value of all the property the amount of all the debts due by all the debtors to all the creditors, and tax that too." Under this provision, if all the property of the State were worth five hundred millions of dollars, and the amount due by debtors to creditors amounted to seventy-five millions of dollars, the tax would be put, not on the value of the property within the State, but on seventy-five millions more than all the value within the State.

*W. H. Patterson* and *John B. Felton*, also for Respondents.

The provision of the Constitution, section thirteen, Article XI, is violated by the Political Code, in providing for a State Board of Equalization, in two respects: First—That Board is composed of three persons, two of whom are appointed by the Governor, and not elected by the people. Second—No one member of such Board is elected by the

qualified electors of the district in which the property to be taxed is situate.    The Controller is not elected as an Assessor, nor for any district, but for the State at large.    In order to support this point it is necessary for us to show that the Board of Equalization are really Assessors of taxable property within the meaning of the word as used in section thirteen before quoted.

It is contended by those who seek to uphold the Board of Equalization, that the word "Assessor," in this section, méans simply an officer who shall make a list and estimate of the value of taxable property, subject to be changed at will in any way the Legislature may point out; which would lead to this absurdity, that the Constitution has provided, as a portion of the unchangeable organic law of the land, in what manner the unimportant officer shall be elected whose valuation may be changed at will, but has made no provision in regard to that higher class of officers whose opinion and valuation are final and controlling.    To show the absurdity of this let us imagine that this provision, in the sense which those who differ with us contend for, were fully written out in the Constitution, it would read thus:    "Assessors of town, county, and State taxes shall be elected by the qualified electors of the district, county, or town in which the property to be taxed for State, county, or town purposes is situated, but the valuation made by such elected Assessors shall have no binding force or effect."    The Legislature, if it chooses, may select any one man from any portion of the State, and confer upon him the arbitrary power of totally disregarding the valuation of the Assessor, and putting on taxable property such valuation as his judgment, non-information, spleen, or malice may dictate, and this with no means of reviewing his determination.    Can a motive be imagined which impelled the framers of the Constitution to thus solemnly provide that this unimportant officer should be elected by the electors of a particular district, and make

no provision for the election of a superior officer, who, practically alone, is to exercise the important duty of valuing taxable property for the purposes of revenue.

The section of the Constitution above quoted is evidently a restriction upon the powers of the Legislature; it is equivalent to saying to that body: You shall not appoint an Assessor; you shall not confer upon the Governor the power to appoint; that power shall alone rest with the qualified electors; they have an inalienable right to elect their own Assessor. What use would there be in such a restriction upon the legislative power if it could be rendered nugatory by appointing, under another name, an officer with power to annul every action of the Assessor? Yet the State Board of Equalization has, by the terms of the statute, the full power to change every valuation of every elected Assessor. If the latter has said a parcel of real estate in his district is worth one hundred dollars, the Board of Equalization can say it is worth only one cent, or one thousand dollars. If the Assessor discovers one hundred thousand dollars in a certain district, that Board can say, you are wrong, there is one million dollars there, or only one cent. The assessment made by the constitutional officer has no legal effect or bearing; he went through, and the Constitution has solemnly provided for, the performance of an idle ceremony. The Constitution has provided for a non-essential, useless, rough estimate of property, but has made no provision as to how the great essential power of finally determining the value of property for revenue purposes shall be exercised.

Is it not a mockery to say to the people: Your right to elect an Assessor cannot be taken from you, but the valuation made by your Assessor shall have no validity or binding force unless your Legislature shall so determine. The Assessor whom you have reserved to yourself this inalienable right to elect, can amuse himself by setting down in a tax book his judgment of the valuation of your property;

but then we, the Legislature, and we, the Board by it created, are not required to pay any attention to his judgment and action.

But it has been said that a State Board of Equalization is justified by the language of the Constitution, "taxation shall be equal and uniform throughout the State;" the proposition seeming to be that this provision leaves the Legislature entirely unrestricted as to the mode of equalizing taxes in the several counties. The powers given to the State Board of Equalization are (Sec. 3693) to add to or deduct from the valuation: First, of the real estate; second, the improvements upon such real estate; third, the personal property, except money; fourth, the amount of money, such percentum respectively as is sufficient to raise or reduce it to the full cash value. This power is clearly a power to arbitrarily change every valuation fixed by the Assessor of the district, and to tax the final valuation, and the only one which determines the percentage of tax to be levied. It is also an unrestricted power of making any one county bear the entire burden of State taxation, for the State Board is the sole judge of the value of the property in each county of the State, and if, exercising its judgment, the Board of Equalization should say that the value of all property situate outside of San Francisco did not exceed one dollar, and in that city and county was ten times in excess of the elected Assessor's estimate and judgment, it would be clearly within their power to say so.

We do not contend that, under our organic law, there is no power of equalization; we only contend that, inasmuch as the power to add to or deduct from the valuation of property at will, is strictly an assessorial power, as it involves and includes the whole power of valuing property for purposes of taxation, it must be exercised by officers elected

by the electors of the district in which the property is situated. County Boards of Equalization are so elected, and may be constitutional Boards of appellate Assessors. They are the only body which has the ultimate right to fix valuation, and this right and power could not be conferred on them were they not elected by the people.

*W. H. Patterson,* also for Respondents.

The Legislature alone can fix the amount of the tax. So far as the Legislature can determine the mode of exercising its powers of taxation, the practice of twenty years has determined that it is for the law maker to fix the rate of taxation. (*Taylor* v. *Palmer,* 31 Cal. 251.) And the power nominally conferred upon the State Board of Equalization by section three thousand six hundred and ninety-two of the Political Code, subdivision six, "at such meeting to equalize the valuation of the property of the several counties in the State, and fix the rate of State taxation" (see Sec. 3696), was not and could not be granted, because it would be a delegation of that authority and discretion which the Legislature alone could exercise; fixing the rate of taxation, or the *ad valorem* tax, is legislation. In this State there is no restriction imposed upon the State Board of Equalization; they have as much authority to fix it at five dollars on the one hundred dollars as at fifty cents. (*Thorn* v. *Cramer,* 15 Barbour, 116, 122, 128.) The legislative power is vested in the Senate and Assembly. (Con., Art. IV.)

If the Board of Equalization had not fixed the rates, no revenue could have been raised; the statutes authorizing an amount to be raised were not self-acting—were incomplete, without the exercise of the delegated authority to fix the percentum, and did not amount to a levy, especially as it was left to the State Board to fix the valuation. Had the statute fixed an *ad valorem* tax of fifty cents on the one hundred dollars, it would have amounted to a levy, and

would have been collectable.   (23 Barb. 355, and other authorities referred to in Cooley's Constitutional Limitations, 117, note; Blackwell on Tax T. 3.)

"Taxes are imposed by the legislative power of the State for public purpose." (Blackwell, 26.) "The tax must have its origin in a law, enacted for that purpose." (34 Cal. 454, bottom of p. 456.) The power to fix the rate of taxation was confided to the Legislature. If that body could delegate it without restriction to a body by it created, then the Legislature would lose the right to exercise its discretion. The State Board of Equalization could not change, by increasing or diminishing the valuation in the several counties fixed by the County Assessor and the County Board of Equalization. (*People* v. *Hastings,* 29 Cal. 455; *Reilley* v. *Lancaster,* 34 Cal.)

The Assessor of the county is a constitutional officer (Constitution, Article XI, Sec. 13),   *   *   *   "but Assessors and Collectors of town, county, and State taxes shall be elected by the qualified electors of the district, county, or town in which the property taxed for State, county, or town purposes is situate." The manifest object of this provision is that the person to make valuations for tax purposes should be selected by the people; that he shall be a local person and consequently cognizant of the value of his neighbors' property.

The same object is carried out by allowing the local Board of Supervisors to act as a "Board of Equalization." Such object is not accomplished by allowing the State Board to fix the valuations.

The State Board is, by the language of the statute (Sec. 3692), empowered "to visit, as a Board, or by the individual members thereof, the several counties of the State, for the purpose of inspecting the property and learning the value thereof." The provision of the Constitution above referred to was a restriction which prohibited the Legislature

from fixing the valuation, or delegating to the Board of Equalization that power; the Assessor only could fix it. (Webster's D., "Assess," "Assessor;" 29 Cal. 451; *Ferris* v. *Coover*, 10 Cal.)

The State Board may increase the valuation. If this is not a delegation of the power to assess, we are unable to define what it is; and by means of it the Board could impose ninety-nine one hundredths of the entire State tax on San Francisco. Again, a discretion is conferred upon the Board to make an allowance for delinquency. This is an arbitrary discretion, governed by no law, no rule, no reason, naught but the mere whim and caprice of the members of the Board. It is the province of the Legislature to make such allowance; it cannot be delegated. Should it happen that the members of the Board should be dishonest, they would have it in their power to make taxes so burdensome as to suspend all enterprise—destroy trade and manufacturing. " The Legislature neither must nor can transfer the power of making laws to anybody else, or place it anywhere but where the people have." (Locke on Civil Government, Sec. 142.)

When the Legislature delegates the power to fix the rate of taxation, to officers unknown to the Constitution, and adds to that the power to raise or diminish the valuations of the property of the citizens, it gives an opportunity to plunder the citizen, against which Constitutions are framed and the Courts are bound to restrain. (Cooley on C. 488; *Tyson* v. *School Directors*, 51 Pa. St. 9; *Merford* v. *Unger*, 8 Iowa, 92–94; *Freelon* v. *Hastings*, 10 Allen, 575.)

*W. H. Patterson* and *T. B. Bishop*, also for Respondents, on the final argument, after rehearing.

Is the Consolidation Act of the City and County of San Francisco still in force, in reference to the levy of city and

county taxes? Unless repealed by subsequent legislation, it, of course, is still in force.

What is the subsequent legislation upon the subject? Section eighteen of the Political Code (Civil Code, Sec. 20; C. C. Pro., Sec. 18,) provides that in all cases provided for by this Code, all statutes, laws, and rules heretofore in force, in this State, whether consistent or not with the provisions of this Code, unless expressly continued in force by it, are repealed and abrogated.

Were this all the subsequent legislation upon the subject, the inevitable result would be, that the Consolidation Act, so far as concerns the levy and collection of taxes, would be repealed, because the case of levying and collecting taxes is provided for by the Political Code. But not so; for the Political Code goes on, and "expressly continues" in force a variety of statutes. (Secs. 19, 697, 698, 1415, Sub. 4; Secs. 1616, 1617, 2326, 2757, 3488, 4087, 4331, 4442.)

Section nineteen provides that nothing in either of the four Codes affects any of the provisions of the following statutes; but such statutes are recognized as continuing in force, notwithstanding the provisions of the Codes, except so far as they have been repealed or affected by subsequent laws:

Sub. 2. All Acts consolidating cities and counties, and Acts amending or supplementing such Acts.

Sub. 25. All Acts in relation to taxation for local purposes.

Well, does the opinion say that if these two sections stood alone and unexplained it would be difficult to escape the conclusion that it was intended to continue in force the Consolidation Act, and all the amendments thereto, including the machinery therein provided for the levying and collection of the city and county taxes?

Surely it would not only be difficult, but absolutely impossible, for even the most ingenious, wholly bent upon

escaping, to do so successfully. If so, then there is an end of argument—there is no question remaining. For it is the first general maxim of interpretation laid down in the best authorities, that it is not allowable to interpret what has no need of interpretation. When the words of an Act are in clear and precise terms; when its meaning is evident, and leads to no absurd conclusions, there can be no reason for refusing to admit the meaning which the words naturally present. To go elsewhere in search of conjecture, in order to restrict or extend the Act, would be but an attempt to elude it—to escape a conclusion.

Such a method, if once admitted, would be exceedingly dangerous, for there would be no law, however definite and precise in its language, which might not, by interpretation, be rendered useless.

However luminous each clause might be, however clear and precise the terms of it, all this would be of no avail if it be allowed to go in quest of extraneous arguments to prove that it is not to be understood in the sense which it naturally presents. When the meaning of the statute is plain, all technical rules as to the force or construction of particular terms, must yield to the paramount will of the Legislature.

When the meaning is satisfactorily perceived and understood, there is no room for a liberal, or strict, or equitable, or large, or narrow, or other construction than according to the meaning.

The Supreme Court of the United States have held that where a law is plain and unambiguous, whether it be expressed in general or limited terms, the Legislature must be intended to mean what it has plainly expressed, and consequently no room is left for construction.

Courts are not justified, in order to give effect to what they may suppose to be the intention of the Legislature, in

putting upon the provisions of a statute a construction not
supported by the words.

Courts are not to presume the intentions of the Legis-
lature, but to collect them from the words of the statute.
They have nothing to do with the policy of the law, nor
with the motives which inspired it, nor with the inconve-
nience resulting from it, but must always presume, where the
language is clear, that it is founded in some view of the
public good.   When, by the clear language of the law, the
Judge is precluded from becoming an interpreter, he is not
justified in becoming a critic.

The above propositions are clear and plain, and are estab-
lished by the weight of great authorities and sound reason.
(*Vide* Vattel *b* 2 Ch. 17, Sec. 262; Smith's Com. on Stat.
and Cons. Construction, Secs. 478, 505, 545, 546, 548, 549,
551, 552, 553, 554, and cases cited; Potter's Dwarris on Stat.,
etc., pp. 124, 126, 135, 143–6, 182–3, note 3, 193, note 12,
196, 199, 200–7, notes, 214, 5; Story on Conflict of Laws,
Introductory Remarks, p. 10; Story Cons., Sec. 392; 6
Dane's Ab. 600; *Jackson* v. *Lewis,* 17 Johns. 477; *Waterford*
y. *Whitehall, etc.,* 9 Barb. 170; *People* v. *N. Y. C. R. R. Co.,*
13 N. Y. 80; *United States* v. *Fisher,* 2 Cranch, 358; *Denn* v.
*Reid,* 10 Pet. 524; 35 N. H. 36; 2 Paine, 584.)

*Nathaniel Bennett,* also for Respondent.

Section thirty-six hundred and ninety-six of the Political
Code is unconstitutional in the particular that it delegates a
portion of legislative power to the State Board of Equaliza-
tion, by empowering such Board to allow for delinquency in
the collection of State taxes.

The Court, in its opinion, is correct in the statement that,
if the Legislature had committed to the Board the task of
making only a mathematical calculation in fixing the rate
of State taxation, we should have uttered no word of com-
plaint under this point.   But the Code goes much further.

It reposes a discretion in the Board, which the Legislature itself ought to have exercised, and which it could not delegate to any person or Board.

A fair test of the question is this: Suppose the Legislature had fixed the rate of taxation to raise the amounts necessary to meet the several sums specified in the eleven subdivisions of section thirty-seven hundred and thirteen of the Political Code, and had then left to the discretion of the Board to determine on such additional amount as the Board should deem proper to make up for delinquencies. Would any lawyer contend that such legislation would be constitutional? Yet no difference in law can possibly be suggested between the case in fact and the supposed case.

*Beatty & Denson,* also for Respondents.

The Legislature could not delegate its power of legislating, in regard to taxes, to the State Board of Equalization. Undoubtedly the Legislature might require a certain amount to be raised by taxation on the taxable property of the State for a certain fiscal year. And they might direct the Board of Equalization to make the calculation (after the property of the State was assessed and equalized) as to what percentage on the assessed value of all the taxable property would be required to collect the requisite amount. They might also direct the Board to allow a certain percentage for cost of collection and loss by delinquency, in making their estimate. The act of the Board would, in such case, be merely ministerial. The result would be fixed by a mathematical calculation. But when the Legislature directed the Board to raise a certain amount of money and to exercise their own discretion as to what should be allowed for delinquency, conferred, or attempted to confer, on the Board, legislative powers, it gave to the Board the power (which is always exercised by every Legislature in fixing the rate percent for purposes of taxation) to estimate and determine what

would be the probable cost of collection, and what the probable delinquency.   Every Legislature, in fixing the rate of taxation, must consider these things, and exercise a proper discretion in fixing the rate of taxation.   To delegate this discretion is to delegate a legislative power, which it is admitted cannot be done.

By the Court, CROCKETT, J.:

In these cases, the defendant, who is Tax Collector for the City and County of San Francisco, appeals from an order refusing to dissolve an injunction obtained by the plaintiffs, enjoining the defendant from the collection of certain State and county taxes, assessed to the plaintiffs for the current fiscal year.   The validity of these assessments is assailed on the several grounds to be hereafter noticed; one of which involves the question of the legality of the entire assessment of taxes for State purposes for the current fiscal year.   If this should be decided for the plaintiffs, it may be unnecessary to determine the other questions discussed by counsel; and it will, therefore, be first considered.

The Political Code, adopted at the last session of the Legislature, establishes a State Board of Equalization, whose powers and duties are minutely prescribed.   As its title imports, the purpose for which the Board was established, was to equalize the assessment of taxes in the several counties, so as to cause them to approximate as nearly as possible to the equality and uniformity enjoined by the Constitution. It had become apparent in this, as in many other of the States, that when the value of property for the purposes of taxation was to be ascertained and finally determined by the local Assessors, subject only to a limited control by the County Boards of Supervisors, the grossest inequality frequently existed in the valuations in different counties,

CAL. REPS. XLVI—60

whereby the requirement of the Constitution that "taxation shall be equal and uniform throughout the State" was practically abrogated. As was observed by Chief Justice BREEZE in *People* v. *Salomon*, 46 Ill. 337, "the small proportion which the actual revenue of the State bore to the real value of the property of the State, under the operation of laws, which, pretending to carry out the behests of the Constitution, that all taxes should be levied by valuation, so that every person and corporation should pay a tax in proportion to the value of his or her property, to be ascertained by some person or persons to be elected or appointed in such manner as the General Assembly might direct, created widespread alarm and dissatisfaction, rendering it an absolute necessity that some effective mode should be devised, by which this constitutional provision might be carried out in its true spirit."

It was to remedy this great evil, that the State Board of Equalization was established; and on which is devolved the duty of supervising the assessments in the several counties, so as to approximate as nearly as possible to equality and uniformity in the imposition of the burden of taxation upon the property of the citizen in proportion to its value. The dominant idea of the Constitution on the subject of taxation is, first, that it "shall be equal and uniform throughout the State;" and second, that "all property in the State shall be taxed in proportion to its value, to be ascertained *as directed by law;*" and, as a part of the system for producing equality and uniformity, it provides that "Assessors and Collectors of town, county, and State taxes, shall be elected by the qualified electors of the district, county, or town in which the property taxed for State, county, or town purposes is situated." The argument for the plaintiffs is, that at the time of the adoption of the Constitution, the term "Assessor" had a definite and well understood meaning, importing that he is an officer appointed or elected to ascertain and determine

the value of property for the purposes of taxation; and that in requiring such an officer to be elected in each "district, county, or town in which the property taxed for State, county, or town purposes is situated," the inference is necessarily implied, not only that he is to make the valuation, but that, when made, his determination as to the value is final; and that the valuation cannot be changed, altered, or in any respect modified, unless possibly by some superior Board or officer, to be elected for that purpose by the electors of that district, county, or town. In support of this view, we are referred to the fact that this provision is peculiar to our Constitution; and, it is claimed, was inserted *ex industria* in deference to the wishes of the native Californians, who were then the proprietors of large landed estates, and were apprehensive that unless the valuation for taxing purposes should be made by local Assessors, to be elected by the people of the district, the burdens of taxation might be imposed chiefly on their lands and herds, to the exclusion of other property.

Whatever weight may be due to this argument, it can hardly be deemed of such conclusive force as to preclude an examination of other provisions of the Constitution in order to determine whether the construction now contended for would not or might not be subversive of one of its fundamental principles. As already stated, the governing rule ordained by the Constitution—the central idea which pervades that instrument in respect to taxation—is that it shall be equal and uniform, and that property shall be taxed in proportion to its value.

As one of the necessary steps towards ascertaining its value, local Assessors must be elected, who shall make the primary valuation. But there is nothing in the instrument to indicate that this valuation was intended to be final. On the contrary, it is expressly provided that the valuation is to be ascertained "*as directed by law*"—which is an explicit

recognition of the power of the Legislature to provide appropriate methods for ascertaining the value, subject only to the limitation that the primary valuation shall be made by local Assessors to be elected by the people of the district. It may be further observed that, when the Constitution was adopted, the term "Assessor" was not understood as defining an officer whose valuations were to be necessarily final. On the contrary, from the earliest period in our American jurisprudence, Assessors had been employed in almost every State for the purpose of making the primary valuation of property for taxation, and in none of them, so far as we are advised, was this valuation final, but was subject to correction and alteration by some supervisory Board or officer. In employing the term "Assessor" the framers of the Constitution must be understood to have used it in this its popular sense. We are, therefore, of opinion that it is competent for the Legislature to provide appropriate methods for equalizing assessments in the several counties.

2. But the validity of the assessments now under consideration is assailed on the further ground that by section three thousand six hundred and ninety-six of the Political Code the Legislature delegated to the State Board of Equalization the power to fix the rate of taxation, and it is claimed that the act is, *pro tanto*, unconstitutional and void. That section is in these words:

"At the same time the Board must determine and transmit to the Board of Supervisors of each county the rate of the State tax to be levied and collected, which, after allowing for delinquency in the collections of taxes, must be sufficient to raise the specific amount of revenue directed to be raised by the Legislature for State purposes."

We do not understand it to be seriously contended that if the Legislature had authorized the Board, on ascertaining the total value of the taxable property in the State in the

manner prescribed by law, and also the amount of the appropriations for the fiscal year, to determine and fix the rate of taxation necessary to produce the requisite amount to meet the appropriations, that this would have been liable to any constitutional objection. The value of the taxable property and the aggregate amount of the appropriations having been ascertained, the rate of taxation requisite to produce the given amount would have been merely a matter of arithmetical computation, involving no exercise of discretion. But the section we have quoted, authorizes the Board, in making the calculations, to make an allowance "for delinquency in the collection of taxes," and it is said that this necessarily involves an exercise of discretion by the Board in a matter materially affecting the rate of taxation, and is, therefore, a delegation of purely legislative power.

That the Legislature cannot, in a general sense, delegate its legislative authority—its power to enact laws—is a proposition which, at this day, no one will question or deny. But whilst the proposition is undoubtedly true in its more general sense, it cannot be maintained in its most restricted sense. As was observed by Mr. Justice Caton, in delivering the opinion of the Supreme Court of Illinois in *The People* v. *Reynolds*, 5 Gilman, 12:

"We may well admit that the Legislature cannot delegate its general legislative authority; still, it may authorize many things to be done by others which it might properly do itself. All power possessed by the Legislature is delegated to it by the people, and yet few will be found to insist that whatever the Legislature may do, it shall do, or else it shall go undone. To establish such a principal in a large State would be almost to destroy the Government. The Legislature may grant ferry privileges, or it may lay out roads and specify their metes and bounds; and yet, who will deny that it may delegate this power to others, either by general or

special laws?   So, also, it may pass all the laws requisite for the government of a particular city or township or school district, and who will doubt the propriety of its authorizing this to be done by the people within the limits of the city, town, or district, by their local representatives, or even directly.   This is making laws, and laws, too, of as binding efficacy as if passed directly by the Legislature.   They are dependent upon the Legislature for their vitality and force, through the act of incorporation or law under and by virtue of which they are made.   Necessarily, regarding many things, especially affecting local or individual interests, the Legislature may act either mediately or immediately.   We see, then, that while the Legislature may not divest itself of its proper functions, or delegate its general legislative authority, it may still authorize others to do those things which it might properly, yet cannot understandingly or advantageously, do itself.   Without this power legislation would become oppressive and yet imbecile.   Local laws almost universally call into action, to a greater or less extent, the agency and discretion either of the people or of individuals, to accomplish in detail what is authorized or required in general terms. The object to be accomplished or the thing permitted may be specified, and the rest left to the agency of others, with better opportunities of accomplishing the object or doing the thing understandingly."

We have quoted thus copiously from the opinion, not only because it comes from a Court of high authority, but also because the propositions it announces appear to be particularly germane to the question we are considering.   This case and the reasoning of the opinion were approved in the late case in the same Court of the *People* v. *Salomon*, 51 Ill. 54.

In *Alcorn* v. *Hamer*, 38 Miss. 654, the controversy grew out of an Act of the Legislature imposing a tax on the lands in certain counties for repairing and maintaining a levee on

the Mississippi River, but subject to a proviso that the tax "shall first be submitted to the legal voters in the district of country proposed to be taxed,   *   *   *   and if a majority of the legal voters residing in the district of country proposed to be taxed vote against the said tax, then the same shall not be levied or collected." Those resisting the tax contended that the statute delegated to the voters the power to decide whether the tax shall be levied and collected, and was therefore void. But the Court, in an able and exhaustive opinion, reviewing the adjudications on this point, upheld the validity of the tax, on the ground that there was no delegation of legislative authority to the voters, but only a condition contained in the statute that the tax should not be enforced if a majority of the electors voted against it. The same proposition has been maintained by the Courts of Pennsylvania, New York, Delaware, Vermont, Illinois, Kentucky, Ohio, Maryland, Alabama and Virginia, and may now be considered as firmly established.

It is said, however, that the question before us is not whether the statute shall take effect or may be defeated on the happening of a future contingency, but whether the Legislature can empower the Board to exercise its judgment and discretion on a subject materially affecting the rate of taxation throughout the State. As already stated, we entertain no doubt whatever as to the power of the Legislature to provide such methods as it shall deem appropriate for equalizing and correcting the valuations in the several counties as a basis for equal and uniform taxation, during each fiscal year. It is equally clear that it is the duty of the Legislature to impose no greater burdens on the people, in the shape of taxation, than shall be reasonably necessary to meet the exigencies of the Government. To perform this duty intelligently, it must first ascertain the total value of the taxable property after the valuations have been equalized. But, as this value is constantly fluctuating, and the taxes

must be paid annually, whilst the Legislature meets only biennially, it is obvious that it is not possible for the Legislature to fix the precise annual rate of taxation understandingly, and without incurring the hazard of either exacting from the people much more than will be required to meet the wants of the Government, or much less than its necessities will demand. If it were to attempt, under these circumstances, to prescribe the precise annual rate, it would act without the necessary data to enable it to form an intelligent judgment, and its conclusions on a subject so vitally affecting the interests and welfare of the people would be founded on a vague conjecture or a blind guess as to the value of the taxable property in the State. But when the annual assessments have been equalized and the value of the taxable property thus ascertained, it would become a mere matter of arithmetical computation to determine what rate of taxation would produce the requisite amount of revenue, were it not that delinquencies, to a greater or less extent, invariably occur in the payment of taxes. To obviate this difficulty section three thousand six hundred and ninety-six of the Political Code, authorizes the State Board of Equalization, in determining the rate of taxation which will produce the requisite amount of revenue to meet the appropriations, to make such allowances as they shall deem sufficient to cover delinquencies. If this can be deemed, in any just sense, a delegation of legislative authority, it is only in that restricted sense referred to by the Supreme Court of Illinois in the *People* v. *Reynolds, supra,* when it says that it is competent for the Legislature to "authorize others to do those things which it might properly yet cannot understandingly or advantageously do itself. * * * The object to be accomplished, or the thing permitted, may be specified, and the rest left to the agency of others, with better opportunities of accomplishing the object, or doing the thing understandingly." In the statute we are consider-

ing, the object to be accomplished was specified, and only the precise method of accomplishing it was left, in an unimportant particular, to the Board, which had better opportunities of accomplishing the object and could do it more understandingly.    We are, therefore, of opinion that this objection to the statute is not well taken.

The plaintiffs also insist that so much of the contested tax as is sought to be collected for city and county purposes is void, because not levied in accordance with what is known as the "Consolidation Act" and the amendments thereto. The argument is, that the general revenue system provided in the Political Code is not applicable to the City and County of San Francisco, which, it is claimed, has been expressly or by necessary implication exempted therefrom.    By section nineteen (1 Political Code, p. 10), it is provided that "nothing in either of the four Codes affect any of the provisions of the following statutes, but such statutes are recognized as continuing in force, notwithstanding the provisions of the Codes, except so far as they have been repealed or affected by subsequent laws:

"1. All Acts incorporating or chartering municipal corporations, and Acts amending or supplementing such Acts.

"2. All Acts consolidating cities and counties, and Acts amending or supplementing such Acts."

The next preceding section provides that "no statute law or rule is continued in force because it is consistent with the provisions of this Code on the same subject, but in all cases provided for by this Code, all statutes, laws, and rules heretofore in force in this State, whether consistent or not with the provisions of this Code, unless expressly continued in force by it, are repealed and abrogated."    If these two sections stood alone and unexplained, it would be difficult to escape the conclusion that it was intended to continue in

force the Consolidation Act and all the amendments thereto, including the machinery therein provided for the levying and collection of city and county taxes. But we are satisfied such was not the intention of the Legislature. The Code provides a complete revenue system, manifestly intended to apply to every county in the State, and which was especially designed to obviate the great inconvenience which had resulted from a multiplicity of provisions in previous statutes, applicable only to particular counties or cities. This had produced the greatest possible confusion in our revenue system, if such a method of levying and collecting taxes could, with any propriety, be termed "a system." For the purpose of curing this great evil, the Code provides a general system, clearly intended to have a uniform operation, and to apply to every county in the State. That the Legislature which adopted the Code understood that the general revenue system which it provides was to apply to San Francisco, is clearly apparent from the Act of March 30th, 1872, entitled "an Act to enable the City and County of San Francisco *to conform to so much of the Political Code as relates to the public revenue.*" (Stats. 1871–2, p. 773.) Under the Consolidation Act, the city and county would have collected its annual revenue, for the fiscal year of 1872–3, in time to meet its necessities for that year. But under the general system established by the Code, the time for the collection of taxes was postponed to a later period; and as the result of this delay the city and county were liable to be greatly embarrassed for want of the necessary funds to meet their current expenses, until the revenue could be collected under the general system provided by the Code. In order to obviate this difficulty, the Act of March 30th, 1872, authorizes the Board of Supervisors to effect a temporary loan, not exceeding nine hundred thousand dollars; and the first section expressly states the object of the Act to be "to enable the City and County of San Francisco to con-

form to so much of the Political Code as relates to the public revenue." It is impossible to construe this statute otherwise than as a distinct recognition by the Legislature that the general system established by the Code was to apply to San Francisco. Otherwise there could have been no necessity for a special Act to enable it to conform to that system, a system, which, on the plaintiff's theory, was to have no effect there. Section nineteen of the Political Code, already quoted, must therefore be construed as though there was excepted from its operation so much of the Consolidation Act and the amendments thereto relating to the levying and collection of taxes as is variant from or inconsistent with the general system provided in the Code.

The last, and we think the most serious question raised on this appeal and discussed by counsel, is, whether a tax on a solvent debt secured by mortgage presents a case of double taxation under our revenue system. If it does, it will be our duty to pronounce it void, and in violation of that clause of the Constitution which requires taxation to be equal and uniform. The question is by no means free from difficulty, and has been several times before this Court in different phases.

In the *People* v. *McCreery*, 34 Cal. 432, the action was to recover from the mortgagee a tax levied on the debt secured by the mortgage, and one of the defenses was, that inasmuch as the land covered by the mortgage was also taxed, it presented a case of double taxation. But we held that if the facts presented a case of double taxation, it was only the mortgagor, and not the mortgagee, whose property had been twice taxed, and that the latter could not complain that the property of the former had been doubly taxed. *People* v. *Whartenby*, 38 Cal. 461, was a similar case, and the same point was again decided. But in *Lick* v. *Austin*, 43 Cal. 590, it was the mortgagor who complained that his real estate had been taxed at its full value, without deducting

therefrom the amount of an existing mortgage to which it was subject; which mortgage was a distinct subject of taxation under the statute. It was claimed that if the land was taxed at its full value, without deducting the mortgage, and if the mortgage debt was also taxed, this would be a double taxation of the same subject matter. But we held that it did not concern the mortgagor whether the mortgaged debt was taxed in the hands of the mortgagee, and that he could not complain of double taxation unless his *own property* was twice taxed. We further held that there is no provision in the Constitution which authorizes the mortgaged debt to be deducted from the value of the land in estimating its value for the purposes of taxation. It must be conceded that the effect of these decisions is, that neither the mortgagor or mortgagee can resist a tax, the one upon the land and the other upon the mortgage debt, on the ground that there has been a double taxation of either. But, in all these cases, the Court apparently proceeds upon the ground that the complaining party is not entitled to relief unless the property has been twice taxed *in his hands;* that it is no concern of the mortgagor whether a mortgage debt held by another person has been taxed, nor of the mortgagee, whether a piece of land on which he holds a mortgage lien, has been taxed for its full value, or otherwise. But this view of the case does not meet the difficulty. The real point to be decided is, whether the *same property* has been twice assessed for the same tax; for it is obvious that, if the subject matter of the tax is the same, it cannot be twice assessed for the same tax; and it is immaterial, in such a case, by whom the title is held. If, for example, the statute should provide that all lands should be assessed on the first of March in each year to the then owners of them, and that if any land thus assessed should be conveyed during the fiscal year, it should be again assessed to the new owner, no one would doubt that, under our Constitution, the second tax would be

void, as violating the principle of equality and uniformity prescribed by that instrument. (*People* v. *Kohl*, 40 Cal. 127.) And yet, in such a case, if the first tax had been paid by the former owner before the conveyance, so that it was no longer a lien upon the land, it might be said that it was no concern of the purchaser that his vendor had been once taxed, nor of the latter that his vendee had been again taxed on the same land. But in such cases, the true point for inquiry is, has the same *property* been twice assessed for the same tax? and in solving this question the fact whether the property belonged to one person or another, is a false quantity. The tax being upon the property itself, the inquiry is, whether *it* has been *twice* taxed, and in solving this point the question of ownership is immaterial.

I come now to the point, whether a tax on land at its full value, and a tax on a debt for money loaned, secured by a mortgage on the land, is, in substance and in its legal effect, a tax on the same *property*. We all know, as a matter of general notoriety, that almost universally, by a stipulation between the parties, the mortgagor is required to pay the tax both on the land and mortgage, and that, practically, he is twice taxed on the same value. If he has still in his possession the borrowed money, to secure which the mortgage was made, the law taxes in his hands both the money and land, and by his stipulation he is required to pay the tax on the mortgage debt also. If the money has passed out of his hands into the possession of some other taxpayer, it is taxed in the hands of the latter; so that the money bears its share of taxation, and the land its share, in the hands of whomsoever they may happen to be. It is very true, as was said in *People* v. *Whartenby*, and in *Lick* v. *Austin*, that a voluntary agreement on the part of the mortgagor to pay the tax on the mortgage debt cannot improve his status. "The State was no party to the contract, and is not bound by stipulation *inter alios*. The burdens of tax-

ation cannot be shifted from those on whom the law imposes them, by stipulations between private persons." But, in the absence of such a stipulation, an inexorable law of political economy would impose upon the mortgagor the burden, in a different form, of paying the tax on the mortgage debt. Interest on money loaned is paid as a compensation for the use of the money, and the rate of interest, as agreed upon, is the amount which the parties stipulate will be a just equivalent to the lender. If, however, by the imposition of a tax on the debt, the Government diminishes the profit which the lender would otherwise receive, the rate of interest will be increased sufficiently to cover the tax, which, in this way, will be ultimately paid by the borrower. The transaction would be governed by the same immutable, inflexible law of trade by reason of which import duties on articles for consumption are ultimately paid by the consumer, and not by the importer. The rate of interest on money loaned is regulated by the law of supply and demand, which governs all articles of commerce; and burdens imposed by law, in the form of a tax on the transaction, which would thereby diminish the profit of the lender, if paid by him, will prompt him to compensate the loss by increasing to that extent the rate of interest demanded. If his money would command a given rate of interest, without the burden, he will be vigilant to see that the borrower assumes the burden, either by express stipulation or in the form of increased interest. This is a law of human nature, which statute laws are powerless to suppress, and which pervades the whole realm of trade, governed by the law of supply and demand. Nor would the enactment of the most stringent usury laws produce a different practical result. Human ingenuity has hitherto proved inadequate to the task of devising usury laws, which were incapable of easy evasion; and wherever they exist they are, and will continue to be, subordinate to that higher law

of trade which ordains that money, like any other article of
commercial value, will command just what it is worth in
the market—no more, and no less.   Assuming these premises
to be correct—and I am convinced they are—it results that
it is the borrower, and not the lender, who, in fact, pays the
tax on borrowed money, whether secured by mortgage or
not.   But if secured by mortgage, he is taxed not only on
the mortgaged property, but on the debt which the prop-
erty represents, and which is held as a security for the debt.
But in solving the question of double taxation on a debt for
money loaned, the true point of inquiry, as I conceive, is
not whether the debt is or is not secured by mortgage, but
whether the money for the use of which the debt was
created is taxed in the hands of the borrower, or of some
other taxpayer, to whom he has paid it.   The money is the
substance, of which the debt is but the shadow and repre-
sentative; and though in a general, and, perhaps, in a strict
sense, it is *property*, it is so only because it is capable of
being again converted into money.   Nevertheless, it but
represents the sum originally loaned; and a tax upon the
latter is substantially a tax upon the former.   This may be
illustrated by a supposed case.   The lien for taxes attaches
on a particular day—say on the first Monday of March—on
which day A. borrows from B. one thousand dollars, and
executes his promissory note for the amount.   Neither is
richer or poorer by the transaction.   A. has one thousand
dollars in money, but he owes that sum to B., who has
parted with the money, but is compensated by the obliga-
tion of A. to repay it.   No new value has been created,
nor, indeed, could be, from the very nature of the trans-
action.   If A. is taxed upon the money, and also upon the
note, as he would be in the form of an increased rate of
interest equal to the tax, as has been already demonstrated,
is it not clear that he would be twice taxed on the same
subject matter, to wit: the one thousand dollars which he

had borrowed? And if, on the same day, A. should loan the same money to C., and take his note for it, C. would also be taxed both on the note and money. This transaction, in my opinion, would present a clear case of double taxation, and may serve to illustrate the views I have endeavored to present.

In the briefs of counsel the question is discussed whether an injunction is the proper remedy in this class of cases. But at the oral argument the counsel united in a request that we would decide the cause on its merits, and not alone on the question of the remedy. In accordance with this request, and in view of the importance of an early decision of the questions involved in the cases, we have considered the cause on its merits. But lest our silence on the question of the remedy might be misconstrued, we deem it proper to dispose of that point also. In these cases there has been no sale of property to satisfy the delinquent tax, and the averment is, substantially, that the title of the plaintiffs to their real estate has been clouded by the assessment and supposed lien for the taxes claimed to be due and remaining unpaid; that the Collector has advertised the property to be sold for the satisfaction of the tax, and will proceed with the sale unless restrained; that if the property is sold there will be numerous purchasers, against whom the plaintiffs may be compelled to bring a multiplicity of actions to recover it back.

If the tax were conceded to be illegal, it does not necessarily follow that, for that reason alone, the plaintiffs would be entitled to an injunction. In *Dows* v. *City of Chicago*, 11 Wallace, 110, Mr. Justice FIELD, in delivering the opinion of the Court, says: "Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of Government, and thereby cause serious detriment to the public. No Court of equity will, therefore, allow its injunction to issue

to restrain their action, except where it may be necessary to protect the rights of the citizen whose property is taxed, and he has no adequate remedy by the ordinary processes of the law. It must appear that the enforcement of the tax would lead to a multiplicity of suits, or produce irreparable injury, or where the property is real estate, throw a cloud upon the title of the complainant, before the aid of a Court of equity can be invoked."

This, we think, is a correct statement of the rule, as established by the weight of authority; and it only remains for us to inquire whether the plaintiffs have brought themselves within it. There is no averment that irreparable injury will ensue if the sale is allowed to proceed; but in the case of the Savings and Loan Society, they allege that if the defendant is permitted to sell, "it will cause plaintiff to have divers litigations and suits against the various purchasers at such sale, which will be attended with great expense, harassment and delay to remove the cloud thereby cast upon said real estate, and will prevent plaintiffs from selling said real estate or any part thereof at the cash value." In the complaint in the case of Doe, there is no averment of this character; but only an allegation that by the Political Code the tax purporting to have been assessed "is attempted to be made a lien" upon the real and personal property of the plaintiffs. This averment is clearly insufficient to support the injunction, as it fails to aver or show that the plaintiffs will suffer an irreparable injury, or that any cloud has been imposed on their title, or that the injunction will prevent a multiplicity of suits. Nor are the averments in the case of the Savings and Loan Society sufficient to authorize an injunction. The allegation that if the sale is allowed to proceed, they may be involved in litigation with the purchasers, is a mere speculation as to probabilities which may or may not occur. *Non constat* that a purchaser will be found, or

that there will be more than one, or that the purchaser will claim the benefit of the purchase, or that he will accept, or that the collector will ever execute a deed for the property. If averments of this description are sufficient to authorize an injunction, the levying of the assessment, and every act performed by the Assessor might be arrested in the same way, on the ground that they were the initiatory steps in a proceeding which might culminate in a sale and Sheriff's deed, and thereby ultimately produce litigation and create a cloud on the title. Probabilities of this kind are too remote to justify the Court in interposing by injunction to arrest the collection of the public revenue.

The orders refusing to dissolve the injunctions are reversed and the causes remanded.

WALLACE, C. J., concurring in the judgment, but dissenting from the opinion in part:

I concur in the judgment, but I dissent from the opinion of Mr. Justice CROCKETT, which maintains the validity of that portion of section three thousand six hundred and ninety-six of the Political Code, which provides that the State Board of Equalization shall determine the amount of delinquency likely to occur in the collection of taxes. In my opinion it is not competent to the Legislature to substitute the judgment of the Board for its own upon that matter, and I think that its exercise by the Board is substantially the exercise of legislative power in the important respect of fixing the rate of taxation to be levied for the support of the State Government.

RHODES, J., concurring specially:

I concur in the judgment and in the opinion, except that portion which holds that property of the kind mentioned in the opinion is not subject to taxation.

[After the delivery of the foregoing opinions a rehearing was granted, and after argument on rehearing the following opinions were delivered at the October Term, 1873.]

By the Court, CROCKETT, J.:

After a careful consideration of the able and exhaustive arguments which were had in these cases since the former opinion was delivered, I see no reason to doubt the correctness of the conclusions announced in that opinion. I adhere to the following propositions: 1st. That the plaintiffs have not made out a case which entitles them to the remedy by injunction.   2d. That the City and County of San Francisco is not exempt from the operation of the general revenue system established by the Code.   3d. That the Act establishing the State Board of Equalization is not unconstitutional on any of the grounds or for any of the reasons alleged, and is a valid and constitutional enactment.   4th. That if a debt for money lent and secured by mortgage be taxed, and if the mortgaged property be also taxed, the same *value* and subject matter has been twice taxed, and it presents a case of double taxation.

In respect to the first three points I do not propose to discuss them anew, having fully expressed my views upon them in the former opinion.   But, as the fourth point presents a question of much difficulty and of great practical importance, I deem it proper to develop somewhat more fully the reasoning in support of the views expressed in the former opinion on this point.

In all countries the principal subject of taxation is *property* in its various forms, and in well regulated Governments the purpose is to impose the burden as equally as possible, so that each parcel of property shall bear its just proportion of the tax.

Having this fundamental principle in view, our Constitu-

tion provides that "taxation shall be equal and uniform throughout the State. All property in this State shall be taxed in proportion to its value, to be ascertained as directed by law." (Article XI, Sec. 13.) In construing this section we have several times decided: First, that *all* the property of the citizen must be taxed, and that it is not competent for the Legislature to exempt from taxation any particular class or species of property held in private ownership. Second, that a solvent debt secured by mortgage is *property* for the purposes of taxation, within the meaning of the Constitution. (*People* v. *McCreery*, 34 Cal. 432; *People* v. *Whartenby*, 38 id. 461; *People* v. *Eddy*, 43 id. 331; *Lick* v. *Austin*, 43 id. 590.) But we have not in any case heretofore decided whether or not a tax on the mortgage debt is practically a tax on the property mortgaged; and whether, if each be separately taxed, it presents a case wherein the same value or subject matter has been twice taxed. The question is therefore *res integra* in this Court; and though it has frequently engaged the attention of legislators and political economists, it is to be regretted that it has been very little discussed in the Courts. It may be observed *in limine* that in examining the question I shall confine myself to the case of a solvent debt for money *lent*, secured by mortgage, which is the case before us. As already stated, it has been settled by the decisions of this Court that a solvent debt is "property," in the sense of the Constitution, for the purposes of taxation; and a solvent debt for money lent, secured by mortgage, stands upon the same footing with other solvent debts, unless it can be demonstrated that a tax on the mortgage debt is, in effect, a tax on the property mortgaged; and that if each be separately taxed there will be a double taxation of the same value or subject matter. In considering this question I shall lay out of view, as not affecting the legal proposition, the well known fact that in a vast majority of cases the borrower is required to stipulate that he will

pay the tax on the mortgage.   If he voluntarily assumes a
burden which the law does not impose upon him, it will be
due to his misfortune or his folly, and cannot be imputed to
the law as a fault.   But assuming that the borrower refuses
to stipulate that he will pay the tax, *eo nomine,* on the mort-
gage, he pays it, nevertheless, in another form, to wit: in a
higher rate of interest.   This must be the inevitable result,
so long as the rate of interest, like the price of any mer-
chantable commodity, is regulated by the law of supply and
demand.   If flour is abundant in the market, the price is
correspondingly low; and as the supply diminishes, the
price advances; so, if money is abundant the rate of in-
terest is low; but if the supply is diminished the rate will
advance in a corresponding ratio.   In other words, the cur-
rent price to be paid for the use of money, like the current
price to be paid for flour or rice, is governed by the law of
supply and demand, which is as inflexible in the one case as
in the other.   Both being subject to the same laws of trade,
the same result must ensue if the Government imposes a
burden upon transactions in each.   If, for example, the cur-
rent market price of sugar would otherwise be ten cents per
pound, and if the State imposes a tax of one per cent on the
seller for every pound of sugar sold, two results would cer-
tainly follow: first, the price of sugar would immediately
advance one per cent; and second, the purchaser would pay
the tax in the form of an increased price for the commodity.
This must be apparent to the dullest comprehension.   For
precisely the same reasons, it is clear that if the current rate
of interest be ten per cent per annum, and if the State im-
pose a tax of two per cent per annum on the lender, the rate
of interest will immediately advance two per cent and the
borrower will pay the tax in the form of interest.   So long
as the use of money, like any merchantable commodity, has
a current market value, regulated by the law of supply and
demand, it is obvious that a tax imposed by the State on

loans must not only to that extent increase the current rate of interest, but it is equally clear that the tax is paid by the borrower and not by the lender. The amount of revenue which the State may raise by taxation is limited only by the discretion of the Legislature, and an emergency might possibly arise in which it would see fit to impose a tax of five per cent on all loans of money, to be assessed to the lender. Can any one doubt that the current rate of interest would immediately advance five per cent, and that the tax would in fact be paid by the borrower, though nominally assessed to the lender? Indeed it would appear to be a self-evident proposition, which no amount of argument could make plainer, that a tax on loans imposed on the lender must necessarily to that extent increase the rate of interest to be paid by the borrower; who, therefore, in fact, pays the tax, though nominally assessed to the lender.

There are, doubtless, exceptional cases, in which, from motives of friendship, or other causes, money is loaned on mortgage without interest, or at a conventional rate, having no reference to the current market rate. But, in a large majority of cases, loans are made at current market rates, which are as definite and as easily ascertained as the current market price of any merchantable commodity, and are governed by the same rule of supply and demand. If money is sometimes loaned at rates above or below the current rate, it is equally true that staple articles of merchandise are often sold above or below the current price. But this does not tend to prove that, as a general rule, the tax on the transaction is not paid in the one case by the borrower, and in the other by the purchaser.

I conclude, therefore, that a tax on loans made in the usual course of business, is paid by the borrower; and if the debt be secured by mortgage, he also pays the tax on the mortgaged property. He is twice taxed—once on the property, and once on the debt which the property represents—and

yet no new value has been created by the transaction.   He
is no richer, and has no more property than he had before;
and if the money which he received from the lender re-
mained in his hands, it is also taxed.   If the money has
passed into the possession of another taxpayer, it is taxed in
his hands; so that the property and the money are each
separately taxed; and if the mere promise or obligation of
the borrower to repay the money is also taxed, and the tax
is paid by him, as it must be, it is clear that he has been
twice taxed on the same value or subject matter.   This is a
violation of that clause of the Constitution which requires
that taxation shall be equal and uniform, and that property
shall be taxed in proportion to its value.   When the mort-
gaged property has once paid its tax, it has discharged its
full obligation to the State, and the owner of it cannot, and
in justice ought not, to be subject to another tax merely be-
cause he has borrowed a sum of money, for which the prop-
erty is pledged as a security.

It is claimed, however, that if the mortgage debt be
exempt from taxation, the effect will be to exonerate the
rich money lender from taxation, at the expense of the pro-
ducing classes.   But, as has been already shown, the tax on
mortgages for money lent is never paid by the lender, but
by the borrower; and the effect of the exemption will be,
not to relieve the lender from a burden, but to exonerate the
*borrower* from an oppressive double tax.   It is the borrower,
and not the lender, who is aggrieved by a tax on mortgages
for money lent.   He has just ground of complaint, for the
reason that the inevitable result of the tax is to raise the
rate of interest which he is compelled to pay; and in this
way the burden falls on him, and not on the lender.   There
is much justice in the complaint that the capitalist, whose
money is loaned out on bond and mortgage, and who is pro-
tected by the laws in his person and property, virtually
escapes taxation, and is not compelled to contribute his just

quota toward the support of the Government. No one can deny that this is unjust towards the producing classes, on whom the burdens of taxation chiefly fall. But past experience, here and elsewhere, proves conclusively that the remedy for this great injustice is not to be found in a tax on mortgages. In this State the fact is notorious, that in ninety-nine out of a hundred cases, the borrower is compelled to stipulate that he will pay the tax on the mortgage before he can obtain the money at the current rate of interest; and if he refuses to stipulate, he will be compelled to pay a higher rate of interest equivalent to the tax; so that the borrower, and not the lender, almost invariably pays the tax. In Connecticut, they have usury laws, prohibiting, under severe penalties, the loaning of money at a higher rate of interest than that fixed by the statute. They also imposed a tax on mortgages, to be paid by the holder of the mortgage. Under this system, the burden of the tax necessarily fell upon the lender. He was prohibited from loaning his money at a higher rate of interest than that fixed by law; and if the borrower stipulated to pay the tax, in addition to the interest, it was an evasion of the usury laws, which would vitiate the transaction. In this way the burden of the tax was inevitably fixed upon the lender. The result was, that loans on bond and mortgage were less profitable than loans on other securities which were exempt from the tax, and on which the current rate of interest was paid. The necessary consequence was, that money could not be borrowed on bond and mortgage, for the simple reason that loans on other securities, not burdened with the tax, were more profitable. The owners of real estate, offering the most ample security by way of bond and mortgage, could not borrow a dollar for the improvement of their property, and a large amount of capital was withdrawn from the State to find more profitable employment elsewhere. In order to remedy this state of affairs, the Legislature passed an Act

providing that "no contract shall be deemed usurious by reason of the borrower's paying, or agreeing to pay, the taxes assessed and paid on the sum loaned;" the effect of which was to impose the whole burden of the tax on the borrower. Consequently, one who borrows on bond and mortgage in that State is compelled to pay the current rate of interest, and the tax besides, whilst one who borrows on other securities is exempt from the tax, thus discriminating against loans secured by mortgage on real estate, which is the best security known, and which should command money at the lowest instead of the highest rate of interest. This state of affairs in Connecticut affords a striking practical illustration of the fact that the tax on a mortgage for money lent, in the usual course of business, is invariably paid by the borrower. It proves further, that if such legislation is had as to fasten upon the lender a tax which reduces the interest he is to receive below the current rate which money commands in the market, he will refuse to loan his money on that class of securities, and such loans will cease. In whatever light the subject is viewed, it is perfectly obvious that the capitalist can never be compelled, by means of a tax on mortgages, to contribute his just quota toward the support of the Government. It is for the Legislature to devise, if practicable, some other scheme which will accomplish the result. But the tax on mortgages, instead of exacting from the lender his just quota of taxes, has no other effect than to raise the rate of interest, and to oppress the borrower. It compels the small land owner, who is obliged to borrow money for the improvement of his property, to r ʼ a higher rate of interest than money commands on a ʼerent and inferior class of securities.

If we were permitted to look into the question of State policy in the levying of a tax on loans, it could be demon-

strated; I think, that such a tax, even if constitutional,
would be eminently unwise and injurious to the public inter-
est. No one can doubt that the necessary result of such a
tax would be to raise the current rate of interest to the ex-
tent of the tax; and in a community where interest is
already exorbitantly high, public policy demands that it
should be reduced rather than increased. But as the con-
sideration of the question as one of political economy be-
longs to the legislative rather than the judicial department,
I forbear to press the inquiry further, except to say that in
certain districts of the States of Pennsylvania and New
Jersey the tax on mortgages has been abolished; and the
effect on those districts may be inferred from the following
extract from the report of a committee, of which David A.
Wells was Chairman, appointed in eighteen hundred and
seventy-one to revise the laws of the State of New York for
the assessment and collection of State and local taxes: "On
the other hand, New Jersey and Pennsylvania, with a wiser
experience, have, as before shown, entirely exempted mort-
gages from taxation over a large part of their territory, and
will undoubtedly at no distant day make the exemption
universal. And here occur points to which special attention
should be given, viz: In both of these States it is repre-
sented to the Commissioners that the demand for this ex-
emption came not in any degree from the capitalists, but
from the small land owners, particularly those of the work-
ing classes, and further, that the influence of the exemption
has been most beneficial to the districts affected by it—so
much so, to use the words of one conversant with the ques-
tion, 'that if it were possible to take in, as if from an emi-
nence, a view of the whole State, the counties in which the
mortgages were exempt from taxation would be as readily
distinguished from the others as would be a field of lux-
uriant wheat or corn from a field of scrub oaks or brush-
wood.'"

This brings me to the last point which I propose to discuss, viz: whether, assuming a tax on mortgages for money lent to be double taxation, the remedy is to be found in the Courts or rests wholly with the Legislature. Because the same subject matter has been twice taxed, it by no means follows that both taxes are void, and that it must escape taxation altogether. On the contrary it justly owes one tax, and if this be paid it may properly claim exemption from the other. When, therefore, it appears that the tax has been once actually paid, the Courts in proper cases may afford the appropriate relief against its collection a second time; or if paid under coercion and protest, it may be recovered back by action. As already stated, the facts of this case do not authorize the remedy by injunction; and this is not an action to recover back taxes paid under protest. I discover no reason why the Courts may not afford the appropriate relief in proper cases, when a tax has been once actually paid, against its collection a second time, or for recovering it back if paid under compulsion and protest. But to entitle a party to relief in the Courts in such a case, it must appear that the tax has been once paid or tendered. It is the province of the Legislature to devise a revenue system which will avoid the evils and injustice of double taxation, and the Courts are incompetent to afford relief in that class of cases, except when the tax has been once paid, by one or the other of the parties to whom it was assessed. In the cases before us it does not appear that the tax has been once paid or tendered by any one; and we are asked to restrain the collection of it from the plaintiffs, on the ground that the revenue laws require the same subject matter of taxation to be assessed to other persons; and it is said that if the tax is paid by each, the result will be that a double tax will have been collected on the same subject matter. If all this be conceded, it presents no case for the interposition of the Courts, whose assistance can be invoked

only after the tax which is justly due has been *once* paid, and it is sought to be collected a second time. Until this event has happened the plaintiffs have suffered no damage.

Orders refusing to dissolve the injunction in these cases reversed and causes remanded.

Rhodes, J., concurring in the judgment, but dissenting from the opinion in part:

I do not propose to discuss at any considerable length the questions involved in these cases. On some of the questions I have heretofore fully expressed my views in the series of cases from *People* v. *McCreery* to *People* v. *Eddy*, and after the very exhaustive argument here, I find nothing in the principles laid down in those cases, which I am prepared to retract or materially qualify. I am also well satisfied with the conclusions announced in the former opinion of Mr. Justice Crockett in these cases, on all the points discussed by him, except one, and deem it unnecessary to add any further reasons in their support. The conclusions to which I refer are: First—That the plaintiffs are not entitled, upon the facts in these cases, to an injunction. Second—That the general revenue law was intended to be operative in all the counties of the State, and that the City and County of San Francisco is not exempt from its operation. And, third—That the statute providing for a State Board of Equalization, and prescribing its duties, is not unconstitutional, on any of the grounds presented by the plaintiffs.

I dissent from a portion of the argument and some of the conclusions of Mr. Justice Crockett, upon his fourth proposition—that in respect to the liability of solvent debts to taxation—and will briefly state some of the reasons which lead me to the conclusion that, under the Constitution, they cannot be exempted from taxation.

The words of the Constitution are so unequivocal, plain,

and clear, that there is scarcely room for construction.   It was conceded by all the counsel for the plaintiffs—and it is beyond all question—that solvent debts are *property*, within the meaning of the words of the Constitution "all property.' This proposition being established, it results inevitably and beyond the possibility of question, that solvent debts are subject to taxation.

The mode and manner in which their value, or the value of the interest of several persons therein, is to be ascertained, are committed to the Legislature.   The Constitution expressly confers that power upon the Legislature in respect to all classes of property, and it cannot be assumed by the Courts.   And unless the Act of the Legislature, under the guise of providing a manner for the ascertainment of the value of property, or of equalizing the value, directly violates the constitutional requirement, that all property shall be taxed, and be taxed in proportion to its value, it is beyond the supervision or control of the judicial department of the Government.   The statutes which ostensibly provided for the listing of property, but which, in fact, exempted from taxation mining claims, and debts secured by mortgage, were of the class referred to, and were unhesitatingly pronounced void.   A statute will not be held unconstitutional, because it may not produce entire equality and uniformity, for exact equality and uniformity are unattainable.   The Courts do not possess the power to abrogate a statute, or any of its provisions, which do, in fact, prescribe the manner in which the value of property shall be ascertained, for the purpose of taxation.

Nor will a statute be declared unconstitutional and void because, under its operation, the same property is liable to be twice taxed.   It is insisted that a tax on a debt for money loaned, and a tax on the property mortgaged to secure the payment of the debt, is necessarily double taxation.   When a horse is sold, and a promissory note given

for the payment of the price, it may be said, in a remote sense, that the note represents the horse—that is to say, the value of the horse; but if the purchaser should execute a mortgage of real estate to secure the payment of the note, or should pledge or mortgage personal property, or give personal security for the same purpose, can it be seriously contended that the mortgaged property, the pledge or the personal security in any sense, even the remotest, represents either the horse or its value? A note for money loaned may represent, in one sense, the money, but in no sense the property mortgaged to secure its payment.

A debt and the property mortgaged to secure its payment are not the representatives of each other. Conceding, however, that money loaned and the note given for its payment represent the same thing—the same value—has the Court any more power to declare that the note shall not be taxed, because the money is liable to taxation, than to hold that the money shall not be taxed, because the note is liable to taxation?—any more power to exempt from taxation a note given on the purchase of a horse, than to exempt the horse?

It was earnestly urged by counsel, that the debt for money loaned should be exempt from taxation, because the taxes must, by the inevitable operation of the rules of trade, be paid by the borrower. Under the operation of the same rules, the consumer pays the tax imposed on all merchantable commodities; and the tenant pays the taxes directly or indirectly on the leased premises. Would that result be urged as a sufficient reason for exempting from taxation all merchantable commodities, and all lands held under lease? Does the fact that the borrowers from a bank pay indirectly the taxes on the bank building, afford a sufficient reason for exempting such building from taxation?

It is also urged, that the contracting of a debt adds nothing to the value of the property in the State, and, therefore, the debt should not be taxed. Bills, promissory

notes, and solvent debts in other forms, are among the modes and means by which property in all civilized countries, is acquired, held, and distributed. The Constitution did not define property; but that term was used in its popular sense, as indicating that which, in a commercial sense, possesses value. The fact that no new value is created by the giving of a promissory note, has no bearing on the question. It is property in the hands of the holder, and ought to bear its just proportion of the taxes levied for the support of the Government.

It is often said that a system ought to be devised, by which each person should pay taxes on the value of his interest in the property in his hands—that is, the value of his property less his debts. With that matter the Courts cannot deal; but the whole subject is committed to the legislative department of the Government.

In my opinion, a solvent debt is subject to taxation in the same manner as property of any other class or character; and is not entitled to exemption from taxation on the ground that some other property for which it was given, or by which its payment is secured, is liable to taxation.

BELCHER, J., concurring in the judgment:

I concur in the judgment and in the three propositions first stated by Mr. Justice CROCKETT, but I do not concur in all his reasoning upon the fourth proposition. It is conceded that a solvent debt is property, and as such is subject to taxation. This being so, the only question is, whether the debts taxed to the plaintiffs, and admitted to be solvent, are doubly taxed. In my opinion, when money is deposited in a savings bank, to be loaned out for the benefit of the depositor, if it is assessed to the depositor and also to the bank, and payment of the taxes is exacted from both, it is double taxation. Nor is it any the less so if the bank has loaned the

money and is taxed upon the note and mortgage which it has received. Practically the bank is but an agent or instrumentality used to loan the money, and the depositor's gains are his proportion of the interest received, after the expenses of the bank are paid.

In the case of the Savings and Loan Society, it does not appear that the taxes had been paid by the depositors on any of their deposits, and, therefore, the question of double taxation does not arise.

WALLACE, C. J., concurring in the judgment, but dissenting from the opinion in part:

The conclusion to which the Court unanimously arrived in the first argument, and to which we all adhere—that these are not cases for equitable interposition by injunction—would seem to render the discussion of any of the other questions which have been argued unnecessary; but inasmuch as by the invitation of the Court a number of able and distinguished counsel participated in the argument, and discussed at great length, both orally and in printed briefs, the constitutionality of those parts of the Political Code prescribing the duties of the State Board of Equalization, and providing for the taxation of credits, I have thought it proper to examine and briefly to state my views on those subjects.

It is unnecessary to consider at length whether the Act, in so far as it *creates* the State Board of Equalization, is unconstitutional, or whether the Board might exist for some of the purposes specified in the Act without substantial interference with the revenue system of the State, for I am irresistibly driven to the conclusion that all those sections defining its most important duties—in fact, making up in the main the legislative scheme discernible in the Act—are unconstitutional: First, because the Board is invested with

the powers of Assessors; and second, because it is authorized to exercise legislative functions.

The Board is not one elected by the people. Two of its members are appointed by the Governor and hold during his pleasure, the Controller of State being ex officio the third member. (Political Code, Sec. 352.) Local Assessors are required to exact from each person, among other things, a statement of "all other facts required by the State Board of Equalization." (Id., Sec. 3629, subd. 6.) The assessment book in each county must show "the total value of all property *after equalization* by the State Board," and *"such other things* as the Board of Equalization may require." (Id., Sec. 3650, subds. 13, 15.) Each Assessor is compelled to transmit a statement to the Board on the first Monday of July in each year. (Id., Sec. 3655.) The Board is directed *"to prescribe rules and regulations to govern* Supervisors when equalizing, and Assessors when assessing," to equalize the valuation of the property of the several counties in the State, and *fix the rate* of State taxation, and to *"personally inspect"* property in the different counties and "learn the value thereof." (Id., Sec. 3692, subds. 2, 6, 7.) It is authorized to raise or reduce the valuation of property for purposes of taxation in the various districts. (Id., Sec. 3693.) "If the County Auditor fails to forward to the State Board of Equalization the statement provided for in Section 3728, the Board must make the equalization from any information it can obtain." (Id., Sec. 3694, vide Sec. 3728.) When the equalization is completed, the Clerk of the Board is to transmit to each County Auditor a statement of the *"percentum to be added to or deducted from* the valuation of the property of the county." (Id., Sec. 3695.) The Board is to *determine* and transmit to the Board of Supervisors of each county the rate of *State tax* to be levied and collected, "which, *after*

*allowing for delinquency in the collection of taxes* must " be
sufficient to raise the specific amount of revenue directed to .
be raised by the Legislature for State purposes. (Id., Sec.
3696.) It is allowed to supply the deficiencies of local
Boards of Supervisors in the matter of allowing certain ex-
penses connected with the revenue, and the amount of these
expenses thus allowed is to be collected through the Con-
troller from the Treasurers of the counties. (Id., Sec. 3704.)
By a certified order sent to the Auditor of any county, it
may extend the time fixed by the Political Code for the
performance of any act to be done during the assessment.
(Id., Sec. 3705.) *Its action in fixing the rate of taxation
for State purposes is, in the absence of action by the Board
of Supervisors, a valid levy of the rate established, which*
must be enforced by the local officers. (Id., Sec. 3715.)
These are the provisions of the Political Code, which figure
most prominently in the reasoning through which my con-
clusion has been reached, and I have italicized those por-
tions which appear to me most important in the discussion.
Article XI, Sec. 13, of the Constitution of the State, is in
the following language: "Taxation shall be equal and uni-
form throughout the State. All property in this State shall
be taxed in proportion to its value, to be ascertained as
directed by law; but Assessors and Collectors of town,
county, and State taxes, shall be elected by the qualified
electors of the district, county, or town, in which the prop-
erty taxed for State, county, or town purposes is situated."

It was contended at the argument that the State Board of
Equalization was established to secure uniformity and equal
taxation throughout the State, and the taxation of all prop-
erty "in proportion to its value," and therefore it was
claimed that its establishment was authorized by the lan-
guage of this section of the Constitution. Leaving wholly
out of view for the moment the last clause of the section,
it may be seriously doubted whether the action of the Board

according to the requirements of the statute would not have an opposite tendency.   It operates not throughout the State as an entirety but in localities within the State, and there is no limitation upon the exercise of its discretion.   It may raise the valuation of the entire property in Santa Clara County and lower the valuation of the entire property in San Francisco, and this without reference to the fact that an individual taxpayer in the former county may have already been assessed too high, or that an individual taxpayer in the latter county may have already been assessed too low.   But irrespective of this injustice likely to accrue to individual taxpayers, the exercise of the power to raise or lower the rate of taxation upon the entire mass of property in each particular locality tends strongly to derange that uniformity and equality in assessments which naturally result from the adoption of local market value as the basis of appraisement. It is indeed self-evident that a revenue system through which the actual cash value of all kinds of property is ascertained by local Assessors must, if honestly administered, produce as nearly a uniform and equal result as any mode of assessment which can be devised; that it fixes the taxation of property "in proportion to its value," and that its symmetry and completeness must be seriously affected, if not wholly destroyed, by any attempt to reconcile those differences in values which are caused by diversities in business, productive capacity and the geographical situation of the local divisions of a great State.   From this point of view it certainly may be claimed, at least with great plausibility, that the action of the State Board of Equalization, as contemplated by the Act under which it proceeds, tends rather to destroy than promote that equality and uniformity in taxation which it was the design of the Constitution to secure.

But however this may be, the last clause of the section of the Constitution which is inseparably connected with the language to which I have just alluded is clear and decisive.

The value of property for purposes of taxation is to be "ascertained as directed by law," that is in such mode and manner as the Legislature may prescribe, "but" through the instrumentality of Assessors "elected by the qualified electors" of the assessment district "in which the property taxed * * * is situated." The mode and manner in which the valuation is to be ascertained is in a measure, and in a great measure, referred to the legislative judgment, but with the restriction that the officer who is to execute the legislative will in this respect must be one whom the people of the locality to be affected have themselves chosen for that purpose.

It is not necessary to refer to the peculiar condition of property rights in the State existing at the time of the formation of the Constitution, in which condition it is historically well known that this clause had its origin, for the language of the clause itself is so clear that neither argument nor illustration could make it more apparent. To hold, therefore, that in prescribing the mere manner of ascertaining the value of property for purposes of taxation the Legislature is at liberty to supersede the Assessor elected by the people and confer his appropriate functions upon an officer of its own nomination, is to wholly ignore a prominent provision of the Constitution of the State having a known reference to the peculiar local condition of the people by whom that instrument was framed and adopted.

There can be no doubt whatever as to the sense in which the word "*Assessors*" is used in the Constitution. It is used there in connection with a proposed system of taxation; but even aside from the purpose most obvious for which the word was employed, as shown by the context, the term possesses a fixed and ascertained legal signification which exactly expresses the popular understanding of its import. It is defined in various expressions, but all the definitions substantially correspond. Thus: "Those that assess public taxes." (Jac.

Law Dic.) "In our law an Assessor is one who has been legally appointed to value and appraise property, generally with a view to levying a tax upon it." (Bouvier's Law Dic.) "An officer chosen or appointed to assess property." (Burrell's Law Dic.) In other words, an Assessor may be said to be a person charged by law with the duty of ascertaining and determining the value of property as the foundation of a public tax. This duty necessarily involves the exercise of judgment. It is the judgment of the officer making the assessment in the first instance. If his judgment as to value is to be subsequently disturbed, or the valuation which he affixed is to be afterwards altered by the action of another person or Board, it is the substitution of their judgment for his, and the person or Board whose judgment is so substituted are necessarily in the exercise of the powers of an Assessor. It is of no avail to designate this power as not in reality a power of assessment, but one of equalization of valuation merely. Its scope and effect is to fix a new and final valuation upon the property to be taxed. It is certainly not the less the power and function of assessment because it assumes at the outset to set aside a valuation already fixed by the local officer regularly elected for that purpose. It is indeed apparent that if the State Controller and the two executive appointees composing the State Board can be constitutionally empowered to set aside the action of the local Assessors and substitute their own judgment of value for his or for that of the local Boards of Equalization elected by the people, they may be constitutionally authorized to make the assessments for themselves in the first instance, and so displace the local Assessors and the local Boards altogether.

The State Board of Equalization, composed of the Controller and the executive appointees, is likened in the argument made for the defendants to the local Boards of Equalization, composed of the members of the Boards of Supervisors in the several counties, and it is claimed that

the repeated decisions of this Court sustaining the authority of the latter go far to uphold the constitutional validity of the former. I am not impressed with the supposed analogy between the two Boards. I have said already in substance in reference to the State Board, that the power to *"equalize"* is the power to assess, and that a Board of officers who alter valuations for the purpose of taxation, though called a "Board of Equalization," are in reality a "Board of Assessors." The local Boards of Equalization or of assessments are composed wholly of officers *elected* by the people, and *quoad* the subject matter intrusted to them they are *Assessors* within the meaning of the Constitution. Attention, however, is called to the fact that it is the habit to elect these officers not for the county at large but by the districts into which the county is subdivided for this purpose, and that it is the practice of each member of the Board to act in equalizing values not alone in the district from which he is elected, but throughout the entire county. However this may be, it is to be remarked that in the local Boards the entire people of the county are represented by officers chosen by themselves, while the State Board has no constituency—its members are not elected by the people to perform the duties of Assessors; two of them hold only at the pleasure of the Executive, and the Controller, who is ex officio a member of the Board, holds only by legislative designation, as the Treasurer or Attorney General might have held—none of them having ever been elected by the people as an Assessor. The local Boards of Assessors, called "Boards of Equalization," and the State Board of Assessors, called the "State Board of Equalization," are therefore wholly unlike in their respective organizations, and derive their respective claims of authority from entirely distinct sources—the former from election by the people, the latter only from legislative designation, or executive appointment. As I have said already, the State Board has no constituency—it represents nobody. Under

the name of equalization it assumes to assess property and fix values for the purpose of taxation throughout the entire State without having received a single vote at the hands of the people for such an office.

That the State Board cannot become Assessors without the warrant of the popular choice for that office is, therefore, clear under the clause of the Constitution already referred to, and which clause, it may be remarked, is in its general characteristic entirely in accord with the great principle broadly underlying the entire system of our Government, that there should be a corelation between taxation and representation.   Indeed a general and persistent opposition to any invasion of that principle has always characterized the people of this country.   A reference to this principle in American government will sufficiently account for the provision in our organic law, that for the purpose of taxation property shall be valued by officers *elected* by the qualified electors in the town, county, or district in which it is situated.   It is incumbent upon the Courts to give full force and effect to that provision, and not to permit it to be frittered away under any pretexts.   It may be urged, and the argument is not without force, that the Legislature *might* have effected a complete separation between State and local taxes, in their assessment and collection, and that so far as the revenue for the support of the State Government was concerned, the "district" mentioned in the Constitution *might* have been coextensive with the limits of the State.   But no such legislation has taken place.   State taxes are collected through local officers.   Thus *one* system is applied to the assessment of property and the collection of revenue for all purposes; and if the system be altered in any part the entire machinery is affected.   And if the State had been constituted one revenue district for the purpose of *State* taxation, the Assessors and officers charged with the duty of equalizing assessments within that district must

have been elected by the people. In *People* v. *Hastings*, 29 Cal. 450, Mr. Justice RHODES, in delivering the unanimous opinion of this Court, holds the following language:

"Section thirteen of Article XI of the Constitution of the State is as follows: 'Taxation shall be equal and uniform throughout the State. All property in this State shall be taxed in proportion to its value, to be ascertained as directed by law; but Assessors and Collectors of town, county, and State taxes shall be elected by the qualified electors of the district, county, or town in which the property taxed for State, county, or town purposes is situated.' The requirement that the value of the property to be taxed shall be ascertained as directed by law, means that the property shall be assessed for the purpose of taxation, and that the taxes may be levied only after the property has been so assessed. An assessment, made as directed by law, is an indispensable basis for the support of the tax that may be levied upon it. The constitutional requirements are not satisfied merely by an assessment made in the manner directed by law, but it is also provided that the Assessors of town, county, or State taxes shall be elected by the qualified electors of the district, county or town in which the property to be taxed is situated—that is to say, that the assessment must be made by a person elected as an Assessor by the qualified electors of such district, county or town. A tax, in order to be valid, must rest upon an assessment made in the mode prescribed by law, and by an Assessor elected as provided for by the Constitution. This proposition requires no argument, for it arises from the plain and unmistakable import of the terms employed in the section cited."

In *People* v. *Sargent*, 44 Cal. 430, the doctrine of the case of *People* v. *Hastings, supra,* on this point, was reaffirmed here. If, then, under the sections of the Political Code

under consideration the State Board of Equalization posses-
ses in substance the powers of Assessors; if it be found,
upon examination, that under those sections the Board can
*change the results* arrived at by the Assessors in the valua-
tions of property within their several districts, then unques-
tionably there is a virtual transfer of the power of assessment,
because to *change* a valuation is certainly, so far as the tax-
payer is concerned, to *fix* a valuation, and to *fix* a valuation
as a basis for the levy of a tax is *an assessment.*

The Board is authorized to prescribe rules for the govern-
ment of Assessors in the performance of their duties, and by
these rules the valuation of property may be materially
affected. The mode prescribed by the Board for ascertain-
ing the cash value of property may be entirely different
from that which, but for its interference, would have been
adopted by the Assessor, and thus the assessment is, or may
be, practically made by the Board, and not by the Assessor.
But this transfer of power is seen more conspicuously in
other sections of the Code. There being but *one* assess-
ment, which is the basis of both local and State taxation,
the process of equalization, in the manner prescribed by the
law, cannot be applied without a disturbance of local valua-
tion. Thus, if the Assessor of San Francisco is directed to
add twenty per centum to his valuation of the *real property*
in his district, then not only does the valuation *quoad* that
species of property become that of the Board, and not of
the Assessor; but the relative valuations of different classes
of property within the same assessment district are neces-
sarily disturbed and altered, the practical result of which is
that the owners of *real estate* will pay a higher tax by twenty
per centum, as compared with the owners of personal prop-
erty in the same district, than they would have paid but for
the interference of the State Board. And in the process of

equalization the Board is governed by no rules except those of its own creation. Its members are required, personally, to inspect the property in the different counties of the State; in other words, individually to perform a most important function of the duties which are, by law, devolved upon the elected Assessors; and upon the knowledge thus acquired, and, in one conjuncture, "upon any information it can obtain," the so-called equalization by the Board may be founded. This is, after all, really to confer upon the Board the power of *original* assessment, which is made to supply the place of the assessment by constitutional officers elected by the "qualified electors." The subject need not be pursued further. In effect, and to all substantial intents and purposes, those sections of the Code which I have considered constitute the State Board of Equalization a Board of Assessors, and in my judgment are in conflict with the plain provisions of the Constitution.

I am also of opinion that those parts of the law which undertake to vest in the Board the authority and duty to fix the rate of taxation amount to a delegation of legislative power, and are therefore a violation of the Constitution. The portions of the Constitution thus violated are the following:

Article III. "The power of the Government of the State of California shall be divided into three separate departments—the legislative, the executive, and judicial; and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any functions appertaining to either of the others, except in the cases hereinafter expressly directed or permitted."

Article IV, Section 1. "The legislative power of this State shall be vested in a Senate and Assembly, which shall be designated the Legislature of California, and the enacting clause of every law shall be as follows: 'The people of the

State of California, represented in Senate and Assembly, do enact as follows.'"

These provisions of the Constitution are merely declaratory of the most essential principle and the principle most jealously guarded in the American system of Government. It would be useless to enter into an extended argument or to cite authorities in support of a proposition which has been so frequently declared and enforced by the judiciary of the American States that it has really become axiomatic. The application of the principle to the case at bar is the only point upon which anything need be said. Now taxation is one of the necessary attributes of sovereignty and the power to lay taxes under our system is one of the powers of Government which does not belong to either the executive or the judicial department, but is vested in the Legislature. "The power of taxation is a necessary incident to sovereignty, and under our system of Government it pertains to the legislative department, for the levying a tax is necessarily a legislative act." (*People* v. *McCreery*, 34 Cal. 454.) And that the right to exercise this power cannot be delegated is another proposition so self-evident that I need not delay to consider it in detail, but may confine myself to an inquiry as to whether there has been an attempted delegation of the power of taxation to the State Board. After having performed the functions of *assessments* (under the name, however, of *equalizing assessments*) that body is directed to fix the rate "of State taxation," which, "*after allowing for delinquencies in the collection of taxes*," must be sufficient to produce the "amount of revenue directed to be raised by the Legislature for that purpose." If the discharge of this duty involved nothing more than an arithmetical computation based upon the total assessed value of the property in the State, it would be an act of a merely executive nature, and, in my opinion, not open to objection of a constitutional character. As for

example, if the Board was only required to ascertain by calculation, and thereupon to declare what rate of taxation upon the total assessed valuation would produce a sum equal to the ascertained amount by law directed to be raised for State purposes, it would be but an agency or instrument by which the legislative will and the legislative judgment, already expressed upon the statute book, would be carried into effect. But the scope of its power as defined in the Code goes clearly beyond this limit, and requires of the Board the exercise of *its own discretion* and *its own judgment* in a calculation of probabilities which it is required to make for itself, an estimate or mere conjecture of the amount of taxes that will remain unpaid after the work of collection is finished, and the levy by the Board of a tax sufficient to cover such delinquency as its judgment may anticipate. That this is the real nature of the power asserted for the Board cannot be doubted upon considering the provisions of the statute under which it proceeds. Indeed, much of the argument of one of the learned counsel who defended the constitutionality of the Act practically conceded this point, for it went to show that in the levy of fifty cents upon the one hundred dollars made by the Board to raise money for State purposes, its judgment was exercised with a degree of circumspection which deserved to be commended, that it *might well have* fixed the rate much higher than fifty cents, etc.—all which, is no doubt true, for undoubtedly there was as much power, as much authority in the Board, to fix the rate upon one hundred dollars at *fifty dollars* as at fifty cents. But with whatever degree of moderation or of wisdom the very estimable gentleman who now compose the State Board may have, in fact, proceeded, their action in fixing the rate of taxation in the exercise of their own judgment and to cover their own estimate of delinquencies to occur, was the usurpation upon their part of those powers to be exercised only by the legislative department of the Government. It is

for the Legislature only—the elected representatives of the people—to determine not only the amount of money to be raised for the support of the State Government and the payment of the public debt, but also the rate of taxation which may be expected to produce the amount; and in making its determination upon the latter point, it is *its* duty to take into consideration all the elements by which a proper conclusion may be attained, and the average proportion of delinquent taxes, as shown by the collection of former years, should be before *the Legislature itself*, and should constitute one of the elements upon which *its* judgment should proceed. If indeed it be competent to the Legislature to substitute the judgment of the State Board for its own in this, the highest function of Government—the imposition of taxation upon the citizen—it is not perceived why it might not constitutionally abdicate its authority entirely, and confer upon the Board the whole mass of its remaining powers. As before suggested, when the amount to be raised, and the actual value of all the taxable property in the State have been ascertained, the rate of taxation necessary to produce that amount can be determined by arithmetic, and therefore the fixing of the rate under such circumstances would be a merely executive act. But the State Board is not restricted within these bounds. The statute, assuming that a proportion of the taxes will not be collected, refers it wholly to the judgment and discretion of the Board: *First*, to estimate and determine what the amount of the anticipated delinquency will be; and, *second*, to increase what would otherwise be the rate of taxation sufficient to cover this estimated delinquency; the result, of course, is that if the judgment of the Board should place the anticipated delinquency at a sum greater than the event proves it to be, the rate of taxation, as fixed by the Board, will be too high, and a larger sum will be collected from the people than the needs of the State require; but the true

and, in my opinion, the unanswerable objection to the va-
lidity of the statute is, that whether the estimate of delin-
quencies, as made by the Board, proves *too high,* or *too low,*
or *precisely correct* in point of fact, the taxes paid by the
people are paid, not in obedience to the expressed judgment
or discretion of the legislative department of the Govern-
ment, but in obedience to the expressed judgment and dis-
cretion of the Board alone, which, in either of the supposed
cases, is the *exercise of legislative power by the Board,* and
therefore unwarranted by the Constitution.

With reference to the question of the assessment, for the
purposes of taxation, of credits, or what have been termed
in argument "solvent debts," the proposition contended for
by the counsel who assail the validity of the tax, seems to
be that the wealth of the State is not increased by local
credits, and, therefore, that such credits ought not to be in-
cluded in the aggregate of the taxable property within the
State.   This proposition may be entirely sound in a politico-
economical point of view; indeed, I am not aware that it
has ever been seriously contraverted by political economists,
and so far as my investigation has extended, it has been
uniformly accepted by the Legislatures of the other States
of the Union.

While, however, it is doubtless true that the material
wealth of the State is not increased by such credits, it by
no means results that these credits are not to be dealt with
as legitimate objects of taxation.   So far as an argument
may be drawn from the legislation of the other States, it
must be acknowledged that all the precedents are in favor
of treating such credits as constituting property for purposes
of taxation.   At the same time, in order to secure as nearly
as may be equality in taxation and to prevent double taxa-
tion, it has been the practice, in some form, to allow a deduc-
tion of the amount of each credit from the debtor's estate—
in other words, to treat each credit as the taxable property

of the creditor in making the assessment.' It may well be admitted that to tax property purchased on credit, and also the credit itself, to their full value in the hands of both debtor and creditor, is flagrantly unjust and a clear violation of the proposition, the soundness of which I have conceded; but this, while it goes to show that in this State the Legislature has disregarded a fixed axiom in political economy, does not prove as a judicial proposition that credits are not property, nor that they should absolutely escape taxation. Indeed it would be difficult to maintain that a citizen whose wealth consists wholly of obligations for the payment of money loaned should not in common with other citizens contribute his pro rata share to the support of the Government by which his person and property are protected. The remedy, however, for any supposed injustice of the kind specified, is not with the Courts but with the Legislature. That absolute equality in the burden of supporting the Government, however desirable, is unattainable by even the most carefully adjusted system of taxation is a truth which all human experience has demonstrated; but while this is the case there is no doubt that such equality may be approximated so as to eradicate from our financial system the odious injustice of double taxation, and at the same time to compel the money lender to contribute his just proportion of the general taxation imposed. It is not, however, for the judicial department of the Government to project or perfect a system of finance.

If the system adopted by the Legislature operates injustice to any person or class of persons, we cannot for that reason interfere, unless it also appear that some provision of the Constitution has been violated in the enactment of the law; all else is mere legislative policy with which we cannot interfere; hence we have no more authority to say that that species of property known as solvent indebtedness is not taxable to the creditor, because it might amount to "double

taxation," than we have to declare that the amount of his debts should be subtracted from the value of the debtor's assessable property. The latter would seem the more just mode of procedure, but neither can be judicially prescribed. My conclusion on this point is that in so far as the Code requires credits to be assessed as property for the purposes of taxation it is not in contravention of the Constitution.

These are the general views I entertained upon the first argument of these causes; but the pressure of the business of the Court at that time prevented me from entering upon a discussion of the questions involved in these appeals.

I am of opinion that the orders below should be reversed, because the cases here are not of equitable cognizance, nor remediable by injunction.

NILES, J., concurring in the judgment, and with WALLACE, C. J.:

I concur in the judgment, and agree with Mr. Justice CROCKETT in the conclusions to which he has arrived, except the one relating to the constitutionality of the Act creating the State Board of Equalization; upon this point I concur in the opinion of Mr. Chief Justice WALLACE.